## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAPLEBEAR INC. d/b/a INSTACART, a Delaware Corporation, <br><br> *Plaintiff,* <br><br> v. <br><br> CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF CONSUMER AND WORKER PROTECTION, and COMMISSIONER VILDA VERA MAYUGA, in her official capacity, <br><br> *Defendants.* | Case No. 25-cv-9979 |

## COMPLAINT

Plaintiff Maplebear Inc., doing business as Instacart, brings this action against the City of New York, the New York City Department of Consumer and Worker Protection, and Commissioner Vilda Vera Mayuga in her official capacity.

## INTRODUCTION

1.      This case arises from the City of New York's failure to stay within the well-established bounds of its authority, under multiple bodies of substantive law. Federal law expressly bars the City from regulating motor-carrier prices, routes, and services. New York law, as the State's high court has held for decades, broadly precludes local regulation of labor issues. And the Constitution prohibits discrimination against interstate commerce. The legislation at issue here, which passed the City Council in late 2025 over the Mayor's partial veto and is set to take effect in January 2026, violates all these limits on the City's power.

2.     The local laws challenged in this suit are the outgrowth of earlier City Council legislation involving a much different industry. After the explosion of restaurant delivery during the COVID-19 pandemic, in 2021 the City launched a novel minimum-pay standard for delivery workers for third-party services that "offered or arranged" deliveries from restaurants. N.Y.C. Local Law No. 115 (Oct. 25, 2021), https://intro.nyc/local-laws/2021-115 (codified at N.Y.C. Admin. Code §§ 20-1501 to -1524). It did not apply to businesses arranging other kinds of services, such as grocery delivery. *See* 6 R.C.N.Y. § 7-802.

3.     Instacart falls into the latter category, operating a digital marketplace that, among other things, facilitates grocery-delivery services. On Instacart's platform, independent contractors can sign up for paid opportunities to work as personal shoppers—they go to retail establishments to select and package items from orders that consumers shop for and place through the platform, and then deliver the items to consumers at their designated time and place. Given the size of grocery deliveries, Instacart shoppers overwhelmingly use full-sized motor vehicles for their work.

4.     After the City regulated them, restaurant-delivery platforms sued the City on multiple grounds. The City ultimately settled that litigation with the restaurant-delivery platforms, but as part of a five-bill package, the City applied the existing minimum-pay standard from that industry to grocery shoppers that use Instacart's platform. That standard was developed for restaurant-delivery workers following a year-long study of restaurant-delivery work and is divorced from the

realities of grocery delivery generally and Instacart's platform more specifically. The City also imposed a host of other requirements—dictating the design and timing of consumer tipping options on Instacart's platform, imposing its own payment-timing and disclosure rules on Instacart's contractual relationships with shoppers, and layering new reporting and recordkeeping mandates.

5.      At the heart of this package is Local Law 124. It creates a new category of covered entities—"third-party grocery delivery services"—which it defines as "any website, mobile application, or other internet service that: (i) facilitates, offers or arranges for the delivery of goods from a retail food establishment; and (ii) *is owned or operated by a person other than the person who owns such retail food establishment*." N.Y.C. Local Law No. 124 § 2 (Sep. 10, 2025) (emphasis added), https://intro.nyc/local-laws/2025-124. It requires only those so-defined "third-party grocery delivery services" lacking their own retail locations to pay "grocery delivery workers" at least the City's restaurant-delivery minimum-pay rate, *see id.*, while authorizing the City Department of Consumer and Worker Protection to craft a separate rate for grocery-delivery workers in the future, *see id.*

6.      Four other new Local Laws surround Local Law 124. Local Laws 107 and 108 dictate when and how Instacart must present tipping options to consumers and what those options must look like. *See* N.Y.C. Local Law No. 107 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-107; N.Y.C. Local Law 108 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-108. Local Law 113 rewrites the payment-timing and disclosure rules that apply to Instacart's contractual shopper relationships. *See*

3

N.Y.C. Local Law No. 113 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-113. And Local Law 123 imposes sweeping recordkeeping and reporting requirements while arming the Department with broad powers to demand Instacart's operational data. *See* N.Y.C. Local Law No. 123 (Sept. 10, 2025), https://intro.nyc/local-laws/2025-123.

7.      The Local Laws are unlawful several times over, all for the same basic reason: the City failed to stay within the bounds of its authority—under federal law, New York State law, the City Charter, and the Constitution.

8.      *First*, the Local Laws are preempted by the Federal Aviation Administration Authorization Act (FAAAA), 49 U.S.C. § 14501. Congress has expressly forbidden state and local governments from regulating the prices and services of motor carriers. The Local Laws ignore these restrictions: Shoppers who use Instacart's platform are motor carriers, and the Local Laws speak directly to their prices and services.

9.      *Second*, the Local Laws are preempted by New York State law. The New York Legislature has long taken charge of minimum-pay standards, and it recently enacted a comprehensive framework for freelance workers. The Legislature has thus covered the relevant waterfront of labor regulation. The City cannot frustrate the State's efforts to set the rules of the road for its labor economy.

10.     *Third*, the Local Laws violate the dormant Commerce Clause. The Constitution reserves to Congress the authority to regulate interstate commerce, and states and localities may not enact discriminate against such commerce. Yet the Local Laws do precisely that, imposing special burdens on out-of-state companies like

4

Instacart while exempting entities with a local retail presence even if they facilitate identical grocery delivery services.

11.    *Fourth*, Local Law 124 improperly delegates legislative power under the New York City Charter. The Charter vests legislative authority in the Council, but Local Law 124 hands the Department the core policy choice of whether and how to create a separate grocery-delivery pay regime, without meaningful standards or constraints for exercising that discretion.

12.    Instacart brings this action to redress these overlapping defects. The Local Laws are scheduled to take effect on January 26, 2026. Without immediate relief, Instacart will be forced to restructure its platform, restrict shoppers' access to work, disrupt relationships with consumers and retailers, and suffer constitutional injuries with no adequate legal remedy.

## JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction over the claims based on the dormant Commerce Clause and federal preemption under 28 U.S.C. § 1331 because they arise under the Constitution or laws of the United States.

14.    The Court has subject-matter jurisdiction over the claims based on New York State law under 28 U.S.C. § 1332. There is complete diversity among the parties. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 97 (1972) ("It is well settled that for the purposes of diversity of citizenship, political subdivisions are citizens of their respective States."), *superseded by statute on other grounds*. And the amount in controversy exceeds $75,000. Instacart seeks declaratory and injunctive relief, so "the amount in controversy is measured by the value of the object of the litigation." *Hunt*

*v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977). Here, "the value of the suit's intended benefit or the value of the right[s] being protected or the injury being adverted," exceeds the jurisdictional minimum. *Kheel v. Port of N.Y. Auth.*, 457 F.2d 46, 49 (2d Cir. 1972) (citation modified). The combined value of the costs of complying with the challenged Local Laws, and the harm to Instacart's reputation and goodwill with shoppers, consumers, and retailers, is well north of $75,000.

15.     In any event, the Court may exercise supplemental jurisdiction over the claims based on New York State or municipal law under 28 U.S.C. § 1367 because these claims are so related to the federal claims that they form part of the same case or controversy.

16.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because (1) one or more of the defendants resides in the District, and all defendants reside in New York State; and (2) a substantial part of the events or omissions giving rise to the claims occurred in the District.

## PARTIES

17.     Plaintiff Maplebear Inc., doing business as Instacart, is a corporation organized under Delaware law with its principal place of business in San Francisco, California.

18.     Defendant City of New York is a municipality organized under the laws of New York State.

19.     Defendant New York City Department of Consumer and Worker Protection is an agency of the City.

20.    Defendant Vilda Vera Mayuga is the Department's Commissioner. She is sued only in her official capacity.

## FACTUAL ALLEGATIONS

### Instacart's Platform

21.    Instacart is a technology company that operates a multi-sided digital marketplace primarily used to facilitate services for grocery shopping and delivery or pickup. The marketplace brings together: (1) independent personal shoppers, who contract with Instacart to provide shopping and delivery services; (2) consumers, who place orders for groceries and other goods; and (3) retailers, like grocery stores, that want to offer online shopping and delivery or pickup of their goods. The marketplace also facilitates interactions with advertisers.

22.    Shoppers access Instacart's platform through a mobile application, called the Instacart Shopper App. When a shopper goes "online"—that is, indicates availability to provide shopping and delivery services—the shopper can select work opportunities that contain one or more consumer orders, called "batches."

23.    Shoppers are independent contractors and have freedom to decide whether to go online at all, when and where to go online, and which batches to accept (if any). Instacart does not require shifts or minimum hours and does not penalize shoppers for declining or ignoring batches.

24.    When a shopper accepts a batch, the Shopper App directs the shopper to the relevant retailer, where the shopper finds and collects the items in the customer's order. This aspect of a shopper's services results in a substantial portion of the shopper's work time being spent on foot inside the retailer's store.

25.    The shopper then delivers the ordered items to the customer's address. Because of the volume, weight, and bulk of the items in a typical groceries order, completing deliveries in New York City by foot or with smaller vehicles, such as mopeds or e-bikes, is generally impracticable. Thus, shoppers in New York City almost always use a full-sized motor vehicle—such as a car or van—to deliver goods to consumers. Based on Instacart's data, over 99% of shoppers who completed batches in the City in the last six months registered on the platform as having a full-sized motor vehicle available for shopping. Further, about 90% of batches available to shoppers in the City are classified as too large for two-wheeled vehicles, and are thus displayed in the Shopper App only to shoppers using four-wheeled vehicles.

26.    For some orders, shoppers exit the City to purchase items from a retailer across municipal or state lines. Such transactions are only natural, given the economic and social interconnectedness of the New York City metropolitan area. They also benefit shoppers, consumers, and retailers alike—shoppers have additional work opportunities, consumers have a larger selection of retailers, and retailers have a larger potential customer base.

27.    Instacart uses a batch-based model to pay shoppers. Instacart offers a shopper a guaranteed amount of "batch pay," calculated based on factors such as expected time, effort, distance, and other operational considerations. Once a shopper accepts a batch and completes the delivery, the shopper is guaranteed at least the quoted batch pay, regardless of how much or little time or distance a batch ends up involving.

28.    Shoppers also may receive tips from consumers. Whether and how much to tip are in the consumer's discretion. Instacart processes tips along with the consumer's payment and disburses 100% of the designated tip amount to the shopper.

29.    Shoppers rely on the flexibility and independence that Instacart's platform offers. Because shoppers have freedom to decide whether, when, and how much to work, they can fit Instacart work around their individual schedules, including caregiving, schooling, or other obligations. A substantial number of shoppers who use Instacart in the New York City area are women, caregivers, and/or people who work part-time.

30.    Like shoppers, consumers typically access Instacart's platform through a smartphone application (separate from the Instacart Shopper App) or through a website accessible in an Internet browser. Consumers place an order by selecting a retailer on Instacart's platform, choosing items to purchase, and scheduling the order for delivery or pickup.

31.    Consumers use Instacart because of its convenience and on-demand nature. Consumers can purchase and receive items from one or more retailers, as well as designate when and where to deliver their order, all without leaving the comfort of their homes. For many consumers—especially seniors, those with disabilities, or those who live in food deserts—delivery of groceries is not just "convenient" but essential.

32.    Instacart offers consumers a broad selection of retailers from which to place orders. Instacart partners with more than 1,800 retail brands, ranging from

national to local institutions and representing nearly 100,000 retail stores across the United States and Canada. Instacart partners with nearly 300 retail brands at approximately 1,800 store locations serving customers in New York City alone.

33.    In turn, retailers depend on Instacart's platform for access to a broad consumer base and for easy and flexible fulfillment of consumer orders. Many retailers chose to partner with Instacart, rather than build their own ecommerce and delivery operations, in no small part because Instacart's technology and the community of shoppers on its platform are already in place. Using Instacart obviates the need for retailers to invest years of time, energy, and money into developing their own technology.

**The City's Minimum-Pay Standard for Restaurant-Delivery Workers**

34.    In 2021, the City adopted Local Law 115, which directed the Department to study the pay and working conditions of app-based restaurant-delivery workers and then adopt a minimum-pay standard. *See* Local Law No. 115. The City Council enacted Local Law 115 against the backdrop of the COVID-19 pandemic, when restaurants relied heavily on restaurant-delivery platforms to stay afloat. *See* Council of the City of N.Y., *Briefing Paper and Committee Report of the Governmental Affairs Division & Committee on Consumer and Business Licensing* 6 (June 8, 2021). A major goal of the legislation was to address the working conditions of restaurant-delivery workers and others in the industry in light of the particular challenges that they faced. *See id.* at 23. These challenges included minimum-acceptance rates imposed by some app-based delivery platforms, a lack of transparency about delivery details offered by those platforms, and the high cost of

purchasing equipment needed to perform the work (including electronic bikes). *Id.* at 5–6, 13.

35.     After collecting data from restaurant-delivery platforms, surveying workers, and engaging with restaurants, the Department issued a minimum-pay regulation. *See* 6 R.C.N.Y. § 7-800. The Department did not collect data from any grocery-delivery platforms, grocery-delivery workers, or grocery stores. *See* N.Y.C. Dep't of Consumer & Worker Prot., *A Minimum Pay Rate for App-Based Restaurant Delivery Workers in NYC* 2 (2022), https://shorturl.at/FcaCz. For good reason: Local Law 115 did not apply to the grocery-delivery platform industry.

36.     Among other things, the minimum-pay standard requires covered restaurant-delivery platforms to choose between two pay methods. The "standard" method requires paying workers based on "trip time" (from order acceptance to completed delivery) and "on-call" time (when a worker is available but not currently completing an order). The "alternative" method hinges on a per-trip rate and a minimum "utilization rate" (the proportion of all workers' trip time to the sum of their trip time and on-call time).

37.     Several restaurant-delivery platforms challenged the regulation in state court. They criticized the Department for excluding other third-party services, including grocery-delivery platforms. They even referred to Instacart by name, complaining that it should have been included in the study and regulations. *See* Verified Pet. ¶¶ 49, 74, 89, 113, 116–19, 125, 143, *DoorDash, Inc. v. DCWP*, No. 155947/2023 (N.Y. Sup. Ct., N.Y. Cnty. July 6, 2023), https://shorturl.at/y363y;

Verified Pet. ¶¶ 17–18, 102, 182, 188, *Uber Techs., Inc. v. DCWP*, No. 155943/2023 (N.Y. Sup. Ct., N.Y. Cnty. July 6, 2023), https://shorturl.at/9mOYL. The court rejected their arguments. *See Uber Techs., Inc. v. DCWP*, No. 155943/2023, 80 Misc. 3d 1221(A), 2023 WL 6528941, at *12–15 (N.Y. Sup. Ct., N.Y. Cnty. Sept. 27, 2023), *leave to appeal dismissed*, 229 N.E.3d 630 (N.Y. 2024).

38.    Once in effect, the regulations had a stark impact on the restaurant-delivery industry. According to Department data, during the first full year of implementation, nearly 40,000 restaurant-delivery jobs disappeared—almost 40% of the workers previously registered as delivery workers. *See* N.Y.C. Dep't of Consumer & Worker Prot., *Restaurant Delivery App Data:* April-June 2024 (2024), https://shorturl.at/ci9ru. A nearly identical decline was seen among the most active workers. Restaurant-order volume growth also dropped to 5%, and consumer fees rose by 46%. Correspondingly, consumers cut back on their tips to workers by 70%. Yet even with that offset, consumers still paid 9% more overall. *See id.* Restaurants also paid more. Although the City had capped fees charged to restaurants by law, fees nonetheless rose by 15%. *Id.*

### The Local Laws Targeting Instacart

39.    After the restaurant-delivery regulations took effect, restaurant-delivery platforms continued to litigate. Several sued the City in federal court, which ruled that they had stated claims for violations of the Constitution and New York law. *See DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268 (S.D.N.Y. 2023).

40.    The platforms began negotiations with City officials over a potential settlement, including potential terms that would require the City to enact legislation

folding Instacart into the same regulatory regime. *See* Nick Garber, *Instacart Vows to Sue If Mayor Adams Doesn't Veto Minimum Wage*, Crain's N.Y. Bus. (July 23, 2025), https://shorturl.at/fqqPe (quoting sources on the city council admitting that legislation covering Instacart was discussed in the negotiations).

41.    Legislation doing just that soon materialized. In December 2024, the City Council introduced a five-bill package, the centerpiece of which—later enacted as Local Law 124—deemed certain "third-party grocery delivery services" a new category of covered delivery platforms. Local Law 124 § 2. Local Law 124 requires a covered platform to "make payments to grocery delivery workers" that match or exceed the amounts it would have owed under the restaurant-delivery standard— without accounting for the differences between restaurant- and grocery-delivery work. *Id.* § 3(e). Local Law 124 also gives the Department broad discretion to adopt a bespoke standard for the grocery-delivery platform industry if it so chooses, but without the requirement to undertake a study of the industry first. *See id.*

42.    The Council passed Local Law 124 and the other four bills on July 14, 2025, each imposing significant additional duties on covered platforms. Local Law 107 requires that a platform provide consumers two predetermined tipping options: a 10% option and a blank option, to be filled by the consumer. *See* Local Law No. 107 § 1. Local Law 108 mandates that the platform present these options "in a conspicuous manner before or at the same time" as a consumer places an order. *See* Local Law No. 108 § 1. Local Law 113 regulates the disclosures and timing of platforms' payments to their workers. *See* Local Law No. 113 § 1. And Local Law 123

imposes a range of operational requirements, from recordkeeping to reporting, some with direct relations to prices. *See* Local Law No. 123 § 1.

43.     In enacting the Local Laws, City Council Members did not hide that they had trained their crosshairs on Instacart. They acknowledged as much in committee reports, public testimony, and press statements. *See, e.g.*, Council of the City of N.Y., *Committee Report of the Governmental Affairs Division & Committee on Consumer and Worker Protection* 10 (July 14, 2025) (referring to Instacart by name); Memorandum to City Council Members on Int. No. 1135-A, at 2 (July 12, 2025) (same); *see also* Nick Graber, *Grocery Apps Object as NYC Council Closes "Instacart Loophole"*, Crain's N.Y. Bus. (July 14, 2025) ("Instacart is fighting really hard to stop this legislation, but we did this because any because any business model that is not able to survive a minimum pay rate is not a successful model." (quoting Councilmember Sandy Nurse)).

44.     Although the Mayor vetoed two of the five bills, on September 10, 2025, the Council voted to override the vetoes. All five Local Laws are now scheduled to take effect on January 26, 2026.

### The Threatened Harm to Instacart

45.     If the local laws take effect, they will irreparably harm Instacart.

46.     To start, Instacart will be forced to overhaul its platform and business model in the City. Because on-call time will become a compensable input in calculating shopper pay, Instacart will no longer be able to allow unlimited, open access to the platform without incurring significant new costs. To manage these new costs, Instacart will have to take several steps, including, for example:

> a.  limiting the windows during which shoppers can go online;
>
> b.  capping the number of shoppers who can be online in a given area at a given time; and
>
> c.  tightly managing how shoppers use their time while online.

47.    In practice, this will require Instacart to restrict access to the platform through "gating," where only a subset of shoppers are allowed to log in during certain times. Instacart may also have to require shoppers to accept all, or a high percentage, of batches offered while they are online, and to remove shoppers from the platform, or restrict access to future batches, if they decline too many.

48.    What's more, because the Local Laws turn on whether an order is picked up, delivered, and/or accepted by a shopper in the City, the complexity of ensuring cross-border deliveries comply with the Laws, and associated costs, may require Instacart to restrict or prohibit such deliveries altogether.

49.    Instacart will have to build and maintain a new system to monitor "aggregate" shopper pay, an important factor under the City's minimum pay-formula, as well as systems for recordkeeping, reporting, and data export.

50.    Many of these costs are hard to quantify. Compliance with the new Laws comes with significant opportunity costs, like lost innovation and delayed product improvements due to the need to divert resources toward compliance. Many costs also are unrecoverable by way of a damages action against the City—even assuming a relevant cause of action provided for damages, which is not true for all of Instacart's claims here.

51.     Further, the Local Laws will damage Instacart's reputation and goodwill with shoppers, consumers, and retailers. Instacart's business depends on the flexibility, independence, and convenience that its platform offers. But the Local Laws will degrade that business and harm precisely what has made Instacart successful. The changes that Instacart will have to undertake in response to the Local Laws threaten to undo central features of the platform, especially those allowing shoppers flexibility to work as they want, including by declining batches and logging into the platform without accepting work. Indeed, shoppers may find themselves unable to access the platform due to necessary gating. Many shoppers will leave Instacart's platform, given that the freedom to work on their own terms would vanish. Customers will see higher fees, fewer options, and worse service as a consequence of fewer shoppers and a less flexible structure. The City's experience after the rules governing restaurant-delivery platforms took effect bears out these concerns. Many of these harms cannot be adequately quantified or compensated by damages.

52.     Finally, Instacart will suffer constitutional injuries under the dormant Commerce Clause. The Local Laws place special burdens on entities like Instacart (called out by name during the legislative process), whereas a retail establishment in the City could offer its own grocery delivery service while avoiding all those burdens, even if it contracted with the very same shoppers as Instacart and provided the very same shopping and delivery services. Violations of federal constitutional rights are paradigmatically irreparable.

## CLAIMS FOR RELIEF

### Count I: Preemption under the Federal Aviation
### Administration Authorization Act (49 U.S.C. § 14501(c)(1))

53.     Instacart incorporates by references all allegations in the preceding paragraphs as if fully set forth herein.

54.     Adopted in 1994, the FAAAA aims to deregulate the activities of motor carriers. It seeks to both reduce federal regulation and prevent a patchwork of state regulation.

55.     To ensure the latter, the FAAAA provides that no State or "political subdivision" may "enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1). A "motor carrier" is "a person providing motor vehicle transportation for compensation." *Id.* § 13102(14). "Transportation" includes "services related to that movement [of property], including arranging for, receipt, delivery, … handling, [and] packing." *Id.* § 13102(23).

56.     Instacart shoppers are motor carriers. Shoppers pick, pack, and deliver goods from local retailers to customers, and they do so using motor vehicles, predominantly cars. *See Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 438 (1st Cir. 2016) (independent contractors who "perform first-and-last mile pick-up and delivery services"); *Mass. Delivery Ass'n v. Healey*, 821 F.3d 187, 192–93 (1st Cir. 2016) (independent couriers "chosen by bidding for routes in response to online advertisements"); *Auto. Club of N.Y., Inc. v. Dykstra*, 520 F.3d 210, 214 & n.2 (2d Cir. 2008) (local tow trucks).

57.    Local Laws 107, 113, 123, and 124 are at least "related to" Instacart shoppers' "price[s], route[s], or service[s]." 49 U.S.C. § 14501(c)(1). State or local actions that "hav[e] a connection with, or reference to, carrier rates, routes, or services are pre-empted … even if a state law's effect on rates, routes, or services is only indirect." *Rowe v. N.H. Motor Transp. Ass'n,* 552 U.S. 364, 371 (2008) (citation modified); *see also Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383–84 (1992); *Schwann,* 813 F.3d at 435–36. The Local Laws here require shoppers to be paid a certain amount and within a certain timeframe, and they dictate when and how Instacart must present consumers with options to tip—an inextricable and core part of shopper compensation.

58.    Accordingly, the Local Laws are preempted by the FAAAA and are invalid and unenforceable as applied to Instacart and the shoppers on its platform.

### Count II: Preemption under the New York Minimum Wage Act (N.Y. Lab. Law §§ 650–665) and the New York Freelance Isn't Free Act (N.Y. Gen. Bus. Law §§ 1410–1415)

59.    Instacart incorporates by references all allegations in the preceding paragraphs as if fully set forth herein.

60.    The New York State Constitution establishes the State government as the preeminent sovereign, and municipalities can enact laws only to the extent that the Legislature has delegated them such authority. *See Baldwin Union Free Sch. Dist. v. County of Nassau,* 9 N.E.3d 351, 359 (N.Y. 2014).

61.    Like its federal counterpart, New York's preemption doctrine is a "significant restriction" on the delegated powers of municipalities. *See People v. Diack,* 26 N.E.3d 1151, 1154 (N.Y. 2015); *see also* N.Y. Const. art. IX, § 2(c); N.Y.

Mun. Home Rule Law §§ 10–11. Preemption can occur when a local government enacts a law that conflicts with State law, or when a local government legislates in a field over which the State Legislature has assumed regulatory authority. *See Eric M. Berman, P.C. v. City of New York*, 770 F.3d 1002, 1005 (2d Cir. 2014).

62.     The New York Minimum Wage Act and related provisions of the State's Labor Law establish a comprehensive framework governing minimum wages, overtime, tip credits, pay frequency, and recordkeeping for employees. *See* N.Y. Lab. Law §§ 650–665, 190–199, 196-d. New York courts have held numerous times that this statutory scheme demonstrates the Legislature's intent to occupy the field and thereby preclude municipalities from legislating on the subject. *See Wholesale Laundry Bd. of Trade, Inc. v. City of New York*, 17 A.D.2d 327, 329 (1st Dep't 1962), *aff'd*, 189 N.E.2d 623 (N.Y. 1963) (mem.); *Jancyn Mfg. Co. v. Suffolk County*, 18 N.E.2d 903, 905 (N.Y. 1987); *Chwick v. Mulvey*, 81 A.D.3d 161, 167–68 (2d Dep't 2010).

63.     Just two years ago, the State Legislature enacted the Freelance Isn't Free Act to supplement the statutory scheme by addressing the relationships between freelancers and hiring parties. *See* Senate Introducer's Mem. in Support, Bill Jacket, L. 2023, ch. 678, https://shorturl.at/AXBLx. The statute provides, for instance, when freelancers must be paid, that a contract between the freelancer and the hiring party must be in writing, and the required content of the contract—including "the rate and method of compensation." N.Y. Gen. Bus. Law § 1412(2)(b); *see also id.* §§ 1410–1415. The Legislature's express premise was that freelancers' compensation would be

contractually established. *See id.* §§ 1410(3), 1411. Consistent with this, Instacart has contracts with the shoppers on its platform establishing the rate and method of their compensation.  And the State's Freelance Isn't Free Act provides specifically that it does not "override or supplant" New York City's freelance-worker laws, *id.* § 1415(5)—indicating that other municipal law does not similarly avoid preemption.

64.    Together, the Minimum Wage Act, relevant provisions of the Labor Law, and the statewide Freelance Isn't Free Act reflect a comprehensive and carefully calibrated State system governing both employee wages and important aspects of independent contractors' compensation and protections.  In short, the State has occupied the field, and municipalities cannot legislate in it.

65.    Local Laws 124, 107, and 108 intrude into the minimum-pay field, which the State has reserved for itself. Local Law 124 seeks to establish a local minimum-pay standard for a class of workers, despite the Legislature's determination that minimum pay is a statewide issue subject to statewide rules. For similar reasons, Local Laws 107 and 108, which establish tipping rules for grocery-delivery workers, are preempted.

66.    Local Law 113, which requires third-party grocery-delivery platforms to pay workers within seven days of their services and provide them itemized disclosures on compensation, intrudes on State provisions controlling the same subject. The Freelance Isn't Free Act already addresses the topics of when contracted compensation must be paid. *See id.* § 1412(2)(c).

67.     Local Law 123, which imposes certain recordkeeping and reporting requirements, among other things, also intrudes on State law. The Freelance Isn't Free Act imposes recordkeeping and reporting duties on hiring parties and vests the Attorney General with enforcement power. *See id.* §§ 1412(3), 1414(1). Yet Local Law 123 would require additional recordkeeping and disclosures to City enforcement officials that exceed and effectively swamp out the requirements under State law.

68.     The Local Laws thus regulate in a field the State has occupied. They represent the City's effort to legislate where the Legislature has already spoken and to replace the State's judgment with its own. They are invalid and unenforceable as applied to Instacart.

## Count III: Dormant Commerce Clause
### (U.S. Const. art. I, § 8, cl. 2)

69.     Instacart incorporates by references all allegations in the preceding paragraphs as if fully set forth herein.

70.     The Constitution's Commerce Clause gives Congress the power "[t]o regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 2. Embedded in that power is an implied limitation on the States and their political subdivisions from adopting laws that discriminate against interstate commerce—the so-called "dormant" Commerce Clause. *See Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 368 (2023).

71.     To run afoul of the Clause, a law need not "discriminate against interstate commerce 'on its face.'" *Variscite NY Four, LLC v. N.Y.S. Cannabis Control Bd.*, 152 F.4th 47, 63 (2d Cir. 2025) (citation omitted). Rather, a law also is

unconstitutional where it "harbor[s] a discriminatory purpose" or "discriminate[s] in its effect." *Id.* (citation omitted); *see Nat'l Pork Prods.*, 598 U.S. at 377.

72.     The Local Laws harbor such a purpose and produce such effects. They expressly apply only to third-party grocery delivery services "owned or operated by a person other than the person who owns such retail food establishment." Local Law No. 124 § 2. The Local Laws thus use obvious proxies to effectively exclude retailers located in the City from regulatory burdens while hamstringing out-of-state companies providing the same services by increasing costs for and erecting barriers to entry into the industry. *See Variscite NY Four*, 152 F.4th at 63. Further, the discriminatory impact on out-of-state business was no accident; the legislative record shows that the City sought to shield local businesses and target out-of-staters. *See, e.g.*, *Hearing Testimony Before the Comm. on Consumer & Worker Prot.* 71 (N.Y., New York, June 21, 2024) (responding to constituent demands to "support local business, and not the giant corporations"); *id.* at 74, 76.

73.     The Local Laws are therefore unconstitutional under the dormant Commerce Clause and invalid and unenforceable as applied to Instacart.

### Count IV: Invalid Delegation of Legislative Power
### (N.Y.C. Charter §§ 21, 28, 32)

74.     Instacart incorporates by references all allegations in the preceding paragraphs as if fully set forth herein.

75.     The City's government is organized under the City Charter. The Charter provides that the City Council "shall be vested with the legislative power of the city,"

N.Y.C. Charter § 21, all legislation "shall be by local law," *id.* § 32, and the Council "shall have power to adopt local laws," *id.* § 28(a).

76.    Although the City Council may empower City agencies to issue regulations, the Council must make fundamental policy choices itself and may delegate regulatory power only if it provides sufficiently concrete standards to cabin agency discretion. *See, e.g., N.Y. Statewide Coal. of Hisp. Chambers of Com. v. N.Y.C. Dep't of Health & Mental Hygiene*, 16 N.E.3d 538, 545–46 (N.Y. 2014); *Boreali v. Axelrod*, 517 N.E.2d 1350, 1355–56 (N.Y. 1987).

77.    By that standard, Local Law 124 is an improper delegation of the City Council's legislative authority. It authorizes the Department to establish a new pay standard "tailored to the circumstances of [grocery-delivery] workers," Local Law No. § 3—but it fails to specify which circumstances are relevant and gives the Department no standards or guidance on how to establish that standard. Unlike Local Law 115—which addressed minimum pay for restaurant-delivery workers— Local Law 124 does not require a structured study and specify factors the Department must consider, like current earnings, transportation modes, expenses, and work patterns, before setting a standard.

78.    By authorizing the Department to create a new grocery-delivery pay regime from whole cloth and without meaningful guidance, Local Law 124 improperly delegates legislative authority in violation of the City Charter.

79.    Local Law 124 is therefore invalid and unenforceable, and any minimum-pay standard the Department purports to adopt under its authority would be invalid as applied to Instacart.

## PRAYER FOR RELIEF

Instacart asks for judgment against Defendants, in the form of:

A.    **Declaratory Relief.**

1.    A declaratory judgment that Local Laws 107, 108, 113, 123, and 124 are preempted by the FAAAA, invalid, and unenforceable against Instacart;

2.    A declaratory judgment that Local Laws 107, 108, 113, 123, and 124 are preempted by the New York Minimum Wage Act, New York's Labor Law, and the New York Freelance Isn't Free Act, invalid, and unenforceable against Instacart;

3.    A declaratory judgment that Local Laws 107, 108, 113, 123, and 124 are in violation of the dormant Commerce Clause, invalid, and unenforceable against Instacart; and

4.    A declaratory judgment that Local Law 124 is an improper delegation of the City Council's legislative authority, invalid, and unenforceable against Instacart.

B.    **Injunctive Relief.**

1.    A preliminary injunction barring Defendants and their agents, departments, and administrative subdivisions

from enforcing Local Laws 107, 108, 113, 123, or 124 against Instacart;

2.    A permanent injunction barring Defendants and their agents, departments, and administrative subdivisions from enforcing Local Laws 107, 108, 113, 123, or 124 against Instacart; and

3.    A permanent injunction barring Defendants from applying or enforcing any minimum-pay standard developed under Local Law 124 to or against Instacart.

C.    **Costs and Attorneys' Fees.** Costs and attorneys' fees pursuant to any applicable statute or authority, including 42 U.S.C. § 1988.

December 2, 2025

Respectfully submitted,


/s/ *Eamon P. Joyce*

Eli Freedberg
Michael Paglialonga
LITTLER MENDELSON, P.C.
290 Broadway Road, Suite 305
Melville, NY 11747
631.247.4713
efreedberg@littler.com
mpaglialonga@littler.com

Alexander T. MacDonald
  (*pro hac vice* movant)
James A. Paretti, Jr.
  (*pro hac vice* movant)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., NW
Washington, DC 20006
202.842.3400
amacdonald@littler.com

Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
212.839.5300
ejoyce@sidley.com

Tobias S. Loss-Eaton
  (admission pending)
Jacob Steinberg-Otter
  (admission pending)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202.736.8000
tlosseaton@sidley.com
jacob.steinbergotter@sidley.com

*Counsel for Plaintiff*