## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAPLEBEAR INC. d/b/a INSTACART,<br>a Delaware Corporation,<br><br>     *Plaintiff*,<br><br>v.<br><br>CITY OF NEW YORK, NEW YORK CITY<br>DEPARTMENT OF CONSUMER AND<br>WORKER PROTECTION, and<br>COMMISSIONER VILDA VERA MAYUGA,<br>in her official capacity,<br><br>     *Defendants*. | Case No. 1:25-cv-09979 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S <u>MOTION FOR A PRELIMINARY INJUNCTION</u>

Eli Freedberg
Michael Paglialonga
LITTLER MENDELSON, P.C.
290 Broadway Road, Suite 305
Melville, NY 11747
631.247.4713
efreedberg@littler.com
mpaglialonga@littler.com

Alexander T. MacDonald
 (*pro hac vice* movant)
James A. Paretti, Jr.
 (*pro hac vice* movant)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., NW
Washington, DC 20006
202.842.3400
amacdonald@littler.com

Eamon P. Joyce
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
212.839.5300
ejoyce@sidley.com

Tobias S. Loss-Eaton
 (admission pending)
Jacob Steinberg-Otter
 (admission pending)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
202.736.8000
tlosseaton@sidley.com
jacob.steinbergotter@sidley.com

*Counsel for Plaintiff*

# **TABLE OF CONTENTS**

Table of authorities..................................................................................ii

Preliminary statement ............................................................................ 1

Background ............................................................................................. 3

    A.    Instacart's platform and shoppers ............................................ 3

    B.    The City's minimum-pay standard for restaurant-delivery workers ...................................................................................... 6

    C.    The Local Laws sweeping Instacart into the restaurant-delivery standard.................................................................................... 8

Legal standard ...................................................................................... 13

Argument .............................................................................................. 13

I.    Instacart is likely to succeed on the merits. ................................... 13

    A.    The FAAAA preempts the Local Laws. ................................. 13

    B.    New York State law preempts the Local Laws. ..................... 18

        1.    Minimum-pay standards are the State's exclusive domain. .......... 19

        2.    Other provisions likewise implicate State preemption. ................. 22

    C.    The Local Laws discriminate against interstate commerce in violation of the dormant Commerce Clause. ......................... 23

II.    Instacart will suffer irreparable harm without an injunction. ....................... 26

    A.    Harm to reputation, goodwill, and business model ............................. 27

    B.    No damages cause of action ................................................... 29

    C.    Constitutional violation ........................................................ 32

III.    Equity and the public interest favor a preliminary injunction. ..................... 32

Conclusion ............................................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Transp. Ass'n of Am., Inc. v. Cuomo*,
  520 F.3d 218 (2d Cir. 2008) ...................................................................... 17

*Amazon.com Servs. LLC v. N.Y. State Pub. Emp. Rels. Bd.*,
  No. 25-cv-5311, 2025 WL 3295071 (E.D.N.Y. Nov. 26, 2025) ............................. 17

*Am. Librs. Ass'n v. Pataki*,
  969 F. Supp. 160 (S.D.N.Y. 1997) ............................................................ 32

*ArcBest II, Inc. v. Oliver*,
  593 F. Supp. 3d 957 (E.D. Cal. 2022) ...................................................... 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ............................................................................ 30

*Ash v. Artpack Int'l, Inc.*,
  No. 96-cv-8440 (MBM), 1998 WL 132932 (S.D.N.Y. Mar. 23, 1998) ................... 15

*Auto. Club of N.Y., Inc. v. Dykstra*,
  520 F.3d 210 (2d Cir. 2008) .................................................................. 15

*B & J Invs. Corp. v. Town Bd.*,
  56 A.D.2d 882 (Dep't 1977) .................................................................. 31

*Baldwin Union Free Sch. Dist. v. County of Nassau*,
  9 N.E.3d 351 (N.Y. 2014) ..................................................................... 18

*Brown v. United Airlines, Inc.*,
  720 F.3d 60 (1st Cir. 2013) .................................................................. 16

*C & A Carbone, Inc. v. Town of Clarkstown*,
  770 F. Supp. 848 (S.D.N.Y. 1991) .......................................................... 32

*Chwick v. Mulvey*,
  81 A.D.3d 161 (2d Dep't 2010) .............................................................. 20

*Cohen v. Bd. of Appeals*,
  795 N.E.2d 619 (N.Y. 2003) .................................................................. 21

*Consol. Edison Co. of N.Y., Inc. v. Town of Red Hook*,
  456 N.E.2d (N.Y. 1983) .................................................................. 22, 23

*Council for Responsible Nutrition v. James,*
  2025 WL 3165673 (2d Cir. Nov. 13, 2025) ............................................. 29

*Data Mfg., Inc. v. United Parcel Serv., Inc.,*
  557 F.3d 849 (8th Cir. 2009) ................................................................. 16

*Dennis v. Higgins,*
  498 U.S. 439 (1991) .............................................................................. 32

*DiFiore v. Am. Airlines, Inc.,*
  646 F.3d 81 (1st Cir. 2011) ................................................................... 16

*Dilts v. Penske Logistics, LLC,*
  769 F.3d 637 (9th Cir. 2014) ................................................................. 18

*DoorDash, Inc. v. City of New York,*
  692 F. Supp. 3d 268 (S.D.N.Y. 2023) ................................................. 1, 8

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin,*
  733 F.3d 393 (2d Cir. 2013) .................................................................. 30

*Eric M. Berman, P.C. v. City of New York,*
  770 F.3d 1002 (2d Cir. 2014) ................................................................ 18

*Goldstein v. Hochul,*
  680 F. Supp. 3d 370 (S.D.N.Y. 2023) ................................................... 33

*Haddock v. City of New York,*
  553 N.E.2d 987 (N.Y. 1990) .................................................................. 30

*Int'l Franchise Ass'n v. City of New York,*
  193 A.D.3d 545 (1st Dep't 2021) .......................................................... 20

*Jacobson & Co. v. Armstrong Cork. Co.,*
  548 F.2d 438 (2d Cir. 1977) .................................................................. 27

*Jancyn Mfg. Co. v. County of Suffolk,*
  518 N.E.2d 903 (N.Y. 1987) .................................................................. 19

*Jolly v. Coughlin,*
  76 F.3d 468 (2d Cir. 1996) .................................................................... 32

*LaForest v. Former Clean Air Holding Co.,*
  376 F.3d 48 (2d Cir. 2004) .................................................................... 29

*Mass. Delivery Ass'n v. Healey,*
  821 F.3d 187 (1st Cir. 2016) ................................................................. 14

iii

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ................................................................ 15

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ...................................................... 33

*Nat'l Pork Prods. Council v. Ross*,
    598 U.S. 356 (2023) ............................................................ 23, 24

*Penny Lane / E. Hampton, Inc. v. County of Suffolk*,
    191 A.D.2d 19 (2d Dep't 1993) .................................................... 23

*People v. Diack*,
    26 N.E.3d 1151 (N.Y. 2015) ........................................................ 18

*Perkins Coie LLP v. Dep't of Just.*,
    783 F. Supp. 3d 105 (D.D.C. 2025) ................................................ 30

*Regeneron Pharms., Inc. v. Dep't of Health & Hum. Servs.*,
    510 F. Supp. 3d 29 (S.D.N.Y. 2020) ............................................... 30

*Rest. L. Ctr. v. City of New York*,
    90 F.4th 101 (2d Cir. 2024) ...................................................... 25

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990) .................................................. 27, 29

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008) ........................................................ 14, 15, 17

*Schwann v. FedEx Ground Package Sys., Inc.*,
    813 F.3d 429 (1st Cir. 2016) ............................................... 13, 14, 15

*Statharos v. N.Y.C. Taxi & Limousine Comm'n*,
    198 F.3d 317 (2d Cir. 1999) ...................................................... 32

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999) ....................................................... 29

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
    60 F.3d 27 (2d Cir. 1995) ........................................................ 27

*Uber Techs., Inc. v. DCWP*,
    No. 155943/2023, 80 Misc. 3d 1221(A), 2023 WL 6528941 (N.Y. Sup.
    Ct., N.Y. Cnty. Sept. 27, 2023) ................................................... 7

*United States v. New York,*
    708 F.2d 92 (2d Cir. 1983) ........................................................................ 30

*UnitedHealthcare of N.Y., Inc. v. Lacewell,*
    967 F.3d 82 (2d Cir. 2020) ........................................................................ 30

*Variscite NY Four, LLC v. N.Y.S. Cannabis Control Bd.,*
    152 F.4th 47 (2d Cir. 2025) .............................................. 23, 24, 25, 26, 27

*Wholesale Laundry Bd. of Trade, Inc. v. City of New York,*
    17 A.D.2d 327 (1st Dep't 1962), *aff'd*, 189 N.E.2d 623 (N.Y. 1963) ........... 2, 19, 20

*Widakuswara v. Lake,*
    773 F. Supp. 3d 46 (S.D.N.Y. 2025) ........................................................ 33

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) ...................................................................................... 13

## Constitutional Provisions & Statutes

U.S. Const. art. I, § 8, cl. 3 ............................................................................ 23

49 U.S.C. § 13102 ........................................................................................ 14

49 U.S.C. § 14501(c)(1) ............................................................................ 14, 15

New York, N.Y., Admin. Code § 20-1501 ........................................................ 7

New York, N.Y., Admin. Code § 20-1521 ...................................................... 24

New York, N.Y., Admin. Code § 20-1522 ........................................................ 6

New York, N.Y., Local Law No. 107 (Aug. 12, 2025) ..................... 10, 11, 15, 16, 22

New York, N.Y., Local Law No. 108 (Aug. 12, 2025) ................................. 11, 22

New York, N.Y., Local Law No. 113 (Aug. 12, 2025) ........................... 11, 15, 16, 22

New York, N.Y., Local Law No. 115 (Oct. 25, 2021) ........................................ 6

New York, N.Y., Local Law No. 123 (Sept. 10, 2025) ..................... 12, 15, 22, 23, 24

New York, N.Y., Local Law No. 124 (Sept. 10, 2025) ..................... 9, 10, 15, 22, 24

N.Y. Gen. Bus. Law § 1410 ......................................................................... 20

N.Y. Gen. Bus. Law § 1411 ....................................................................... 20, 22

N.Y. Gen. Bus. Law § 1412................................................................ 20, 21, 22, 23

N.Y. Gen. Bus. Law § 1413................................................................ 20

N.Y. Gen. Bus. Law § 1414................................................................ 20, 23

N.Y. Gen. Bus. Law § 1415................................................................ 20, 21

N.Y. Lab. Law §§ 650–665................................................................ 22

N.Y. Mun. Home Rule Law § 11(1)(f)................................................ 20

6 R.C.N.Y. § 7-810............................................................................ 7

## Other Authorities

*Affect*, Oxford Eng. Dictionary (rev. 2008)....................................... 20

H.R. Conf. Rep. No. 103-677 (1994) ................................................. 13

*How Earning with Instacart Works*, Instacart,
    https://shorturl.at/8cONJ (last visited Nov. 21, 2025)................. 6

*Minimum Wage*, N.Y. State Dep't of Lab.,
    https://dol.ny.gov/minimum-wage (last visited Nov. 21, 2025)........... 19

Nick Garber, *Grocery Apps Object as NYC Council Closes "Instacart
    Loophole"*, Crain's N.Y. Bus. (July 14, 2025)
    https://shorturl.at/xPZkr ....................................................... 12

Nick Garber, *Instacart Vows to Sue If Mayor Adams Doesn't Veto
    Minimum Wage*, Crain's N.Y. Bus. (July 23, 2025),
    https://shorturl.at/fqqPe ....................................................... 8

N.Y.C. Dep't of Consumer & Worker Prot., *A Minimum Pay Rate for
    App-Based Restaurant Delivery Workers in NYC* (2022),
    https://shorturl.at/FcaCz ....................................................... 6-7

N.Y.C. Dep't of Consumer & Worker Prot., *Restaurant Delivery App
    Data: April–June 2024* (2024), https://shorturl.at/ci9ru ............... 8, 29

*Understanding the Shopper Community: A Report*, Instacart (June 8,
    2023), https://shorturl.at/2wBFt ............................................. 28

## PRELIMINARY STATEMENT

The Court should grant a preliminary injunction because New York City has overstepped its authority, in relation to both the federal and state governments, by adopting the challenged package of laws. These Local Laws regulate compensation levels, tipping options, payment timing and disclosures, and recordkeeping for the entities it defines as "third-party grocery delivery services" and the "grocery delivery worker[s]" who offer services through them—that is, for Instacart and the "shoppers" who use Instacart's platform. Indeed, these laws are aimed directly at Instacart and would require radical business changes that would irreparably harm the company. But these laws are invalid because they are preempted by both federal and state law and they violate the dormant Commerce Clause.

The City first adopted a similar set of laws for restaurant-delivery platforms like DoorDash or Uber Eats. They included a minimum-pay standard based on data and feedback from the restaurant-delivery platform industry. Those laws had significant effects. The City's own data showed that restaurant-delivery prices went up, tips went down, and jobs went away.

Undeterred—including by litigation in which a judge of this Court upheld alleged constitutional challenges to those laws, *see DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268 (S.D.N.Y. 2023)—the City has now tried to essentially fold Instacart into the same scheme. After much litigation and lobbying by the restaurant-delivery platforms—including lobbying that, according to the media, explicitly urged that Instacart should suffer the same restrictions—the City Council targeted

Instacart by name, with lawmakers declaring that it should either meet the City's new standards or go out of business. It did not matter that those standards were developed for the restaurant-delivery platform industry, which operates differently from grocery delivery. The Council adopted the Local Laws and then overrode the Mayor's veto of the earnings standard. The Local Laws are set to take effect on January 26, 2026.

These laws, however, are invalid. *First*, they are preempted by the Federal Aviation Administration Authorization Act (FAAAA). To foster innovation, competition, and low prices, the FAAAA preempts state or local laws that relate to the prices, routes, or services of "motor carriers," *i.e.*, people who use motor vehicles to transport property for compensation or provide related services like packing and delivery. Instacart shoppers do all those things, so they are covered by the FAAAA. And the Local Laws relate to shoppers' prices and services—indeed, they directly regulate prices in various ways and they thus have significant effects on shoppers' services.

*Second*, these laws violate well-settled New York State law on the division of power between the State and its municipalities. The State has broad power to preempt municipal attempts to legislate, and these State preemption principles have special force in the labor context. For over 60 years, it has been the law that the State's Minimum Wage Act preempts municipality efforts to require higher wages. *See Wholesale Laundry Bd. of Trade, Inc. v. City of New York*, 17 A.D.2d 327, 329 (1st Dep't 1962), *aff'd*, 189 N.E.2d 623 (N.Y. 1963) (mem.). The State Legislature has only

broadened the rules governing the labor economy since then, including by enacting the Freelance Isn't Free Act to address a host of issues concerning freelancers. The Local Laws nonetheless try to regulate these subjects and thereby interfere with the State's legislative scheme.

*Third*, the Local Laws violate the Constitution's dormant Commerce Clause. They treat Instacart and other out-of-state entities differently from New York entities with grocery delivery services. The Laws' regulation of wages and conditions of work for shoppers who are independent contractors of Instacart would be categorically inapplicable to those same workers if only Instacart had retail stores in New York. The Constitution does not tolerate such discrimination.

And absent injunctive relief, the Local Laws will impose significant, irreparable injuries on Instacart, including by harming its reputation and goodwill, including with shoppers, consumers, and retailers (all of which Instacart's business model depends upon), and subjecting Instacart to constitutional violations.

## BACKGROUND

A.    Instacart's platform and independent shoppers

Instacart is a technology company that operates a multi-sided digital marketplace, or platform. The platform allows consumers to arrange for, among other things, grocery shopping and delivery services from local retailers. Consumers can access the platform through a web page or, more often, a smartphone app. Shopping and delivery services on the Instacart platform are provided by independent "shoppers" with whom Instacart contracts. Like consumers, shoppers access the platform through an app. The Shopper App displays orders placed by consumers with

various local retailers. A shopper can then choose which orders to shop for and deliver.

Orders are referred to as "batches." Shoppers need not fulfill any particular batch or number of batches; they can choose to take one batch, several, or none. Declaration of Jacqueline Tandler ¶¶ 6–7 [hereinafter Tandler Decl.]. That choice gives shoppers broad flexibility over how to structure their workdays. Shoppers can balance personal activities and obligations with whatever work they decide to do. In short, each shopper can decide when, where, and how often to work. Instacart puts no limits on when or how often shoppers access the platform. A shopper can log in or out of the platform on any day at any time. Upon log-in, shoppers are presented with a range of available batches in their area. A shopper can browse these batches and, if any fit the shopper's immediate preferences, choose to accept one. The shopper is then guided to the local retailer, where they find and collect the customer's items. When the items are shopped and paid for, the shopper delivers them to the customer. *Id.* ¶ 8.

Most often, these deliveries involve groceries. Grocery orders often include multiple items, sometimes dozens. It is generally impractical to deliver these orders using a smaller vehicle, such as a moped or e-bike. *Id.* ¶ 11. Based on Instacart's data, more than 99% of shoppers who completed batches in New York City in the last 6 months registered on the platform as having a full-sized motor vehicle available for shopping. *Id.* Further, under current platform parameters, roughly 90% of batches available to New York City shoppers are offered only to shoppers registered with four-

wheel vehicles. *Id.* Most grocery batches involve physically shopping a customer's order—going into a store, walking up and down the aisles, selecting the customer's items, paying at a register, and carrying the items to a car. Much of a shopper's worktime is therefore spent on foot. *Id.* ¶ 9. This contrasts with on-demand restaurant-delivery work, in which a worker spends only a few minutes collecting a pre-packed order and heading back to a car (or more often, an e-bike or moped).

For this work, shoppers are compensated with a guaranteed, fixed payment, or "batch pay." *Id.* ¶ 13. The batch pay amount is shown to a shopper before accepting the batch, and it is always paid to the shopper as long as the shopper completes the batch. *Id.* ¶ 14. The specific amounts paid are contractual. Before offering services on the platform, shoppers sign an Independent Contractor Agreement specifying that batch and incentive pay may vary by batch. By accepting the batch, the shopper agrees to complete the batch for the offered pay. In turn, Instacart agrees to pay the shopper within 30 days. *See* Instacart Independent Contractor Agreement ¶ 3, https://shorturl.at/fuHgi (last visited Nov. 29, 2025) (Ex. A).[1] Shoppers generally control their compensation by choosing which batches to accept and which to decline. Shoppers have complete discretion over batch selection and are never penalized for declining. *Id.* ¶ 7.

In addition to batch pay, bonuses, and incentives, the Instacart platform includes an optional tipping tool that allows a customer to show their appreciation

---

[1] All exhibits are attached to the Declaration of Eamon P. Joyce.

for good service. A tip is processed with the customer's payment and disbursed to the shopper. The shopper keeps 100% of the tip. *Id.* ¶ 15.

A shopper also has ongoing access to information about the batches he or she accepts. The Shopper App includes a menu listing completed batches and the associated compensation, broken down by batch pay, incentives, and tips. Shoppers can also sort their earnings by week or day, seeing how much they made in a specified period from batch pay and tips. This information is available to the shopper at any time.[2]

B.    The City's minimum-pay standard for restaurant-delivery workers

In 2021, the City adopted Local Law 115, which directed the City's Department of Consumer and Worker Protection to study restaurant-delivery workers' working conditions, including how they were paid, how their pay was determined, what expenses they incurred, what equipment they used, how many miles they traveled, and other circumstances. *See* New York, N.Y., Local Law No. 115 (Oct. 25, 2021), https://intro.nyc/local-laws/2021-115. It then instructed the Department to compile that data and establish a minimum-pay standard. *See* New York, N.Y., Admin. Code § 20-1522.

For the next year, the Department collected data. It issued subpoenas to major app-based restaurant-delivery platforms, surveyed restaurant-delivery workers, and collected feedback from restaurants. It did not collect data from any grocery-delivery

---

[2] *See How Earning with Instacart Works*, Instacart, https://shorturl.at/8cONJ (last visited Nov. 21, 2025).

platforms, grocery-delivery workers, or grocery stores. *See* N.Y.C. Dep't of Consumer & Worker Prot., *A Minimum Pay Rate for App-Based Restaurant Delivery Workers in NYC* 2 (2022), https://shorturl.at/FcaCz. Drawing on this restaurant-industry data and feedback, the Department then proposed and revised a minimum-pay standard setting forth a complex, multi-prong calculation to determine minimum pay. *See* 6 R.C.N.Y. § 7-810 (codifying proposal).

Soon after the Department finalized its regulations, several restaurant-delivery platforms sued the agency in state court. Among other things, they criticized the Department for excluding some third-party services, including grocery-delivery platforms. They referred to Instacart by name, complaining that it should have been included in the study and regulations. *See* Verified Pet. ¶¶ 49, 74, 89, 113, 116–19, 125, 143, *DoorDash, Inc. v. DCWP*, No. 155947/2023 (N.Y. Sup. Ct., N.Y. Cnty. July 6, 2023), https://shorturl.at/y363y; Verified Pet. ¶¶ 17–18, 102, 182, 188, *Uber Techs., Inc. v. DCWP*, No. 155943/2023 (N.Y. Sup. Ct., N.Y. Cnty. July 6, 2023), https://shorturl.at/9mOYL. The court rejected that argument, holding that the law and regulations properly applied only to restaurant-delivery platforms. *See Uber Techs., Inc. v. DCWP*, No. 155943/2023, 80 Misc. 3d 1221(A), 2023 WL 6528941, at *12–15 (N.Y. Sup. Ct., N.Y. Cnty. Sept. 27, 2023), *leave to appeal dismissed*, 229 N.E.3d 630 (N.Y. 2024); *see also* New York, N.Y., Admin. Code § 20-1501 (defining "food service establishment" and "third-party food delivery service").

The regulations then took effect in the restaurant-delivery platform industry. The results were stark. According to the Department's data, during the first full year

of implementation, nearly 40,000 restaurant-delivery jobs disappeared. That meant almost 40% of the workers previously registered as delivery workers stopped working in the industry. *See* N.Y.C. Dep't of Consumer & Worker Prot., *Restaurant Delivery App Data: April-June 2024* (2024) [hereinafter *2024 Delivery App Data*], https://shorturl.at/ci9ru. A nearly identical decline was seen among the most active workers. Restaurant-order volume growth also dropped to 5%, and consumer fees shot up by 67%. Unsurprisingly, consumers chose to offset that cost by reducing their tips to workers, which fell by 70%. Yet even with that offset, consumers still paid 9% more overall. *See id.* Restaurants also paid more. Though the City had capped fees charged to restaurants by law, the Department still found that fees rose by 15%. *Id.*

C.    The Local Laws sweeping Instacart into the restaurant-delivery standard

After the regulations took effect, the regulated restaurant-delivery platforms continued to litigate. Several sued the City in federal court, which ruled that they had stated claims for violations of the Constitution's dormant Commerce Clause, Contracts Clause, Takings Clause, Due Process Clause, and Equal Protection Clause, and for exceeding its powers under New York law. *See DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268 (S.D.N.Y. 2023). The platforms began negotiations with City officials over a potential settlement, which they ultimately reached. *DoorDash, Inc. v. City of N.Y.*, No. 1:21-cv-7564-GHW, Dkt. 158 (S.D.N.Y.). The media reported that among the settlement terms discussed was legislation to fold Instacart into the same regulatory structure. *See* Nick Garber, *Instacart Vows to Sue If Mayor Adams*

8

*Doesn't Veto Minimum Wage*, Crain's N.Y. Bus. (July 23, 2025), https://shorturl.at/fqqPe (Ex. H) (quoting sources on the city council).

That legislation ultimately appeared in a five-bill package. The centerpiece was the bill that became Local Law 124. *See* New York, N.Y., Local Law No. 124 (Sep. 10, 2025), https://intro.nyc/local-laws/2025-124. Local Law 124 created a new category of covered delivery platforms: "third-party grocery delivery services." This law covers Instacart and requires it to "make payments to grocery delivery workers" that match or exceed the amounts it would have owed under the restaurant-delivery standard—without accounting for the differences between restaurant and grocery delivery work. *Id.* § 3(e). Local Law 124 also gives the Department broad discretion to adopt a bespoke standard for the grocery-delivery platform industry if it so chooses. *See id.*

Local Law 124 is aimed squarely at Instacart. City Council Members made no secret of this: They acknowledged in committee reports, public testimony, and press statements that Instacart was their target. *See, e.g.*, Council of the City of N.Y., *Committee Report of the Governmental Affairs Division & Committee on Consumer and Worker Protection* 10 (July 14, 2025) (Ex. B) (referring to Instacart by name); Memorandum to City Council Members on Int. No. 1135-A, at 2 (July 12, 2025) (enacted as Local Law 124) (Ex. C) (same).

Local Law 124's new pay standard will harm Instacart's business and its relationships with shoppers, consumers, and retailers. *See* Tandler Decl. ¶¶ 26, 40. The standard requires payments for both on-call time and trip time. Because on-call

time will be newly compensable, the Laws fundamentally redefine the Instacart platform and Instacart's relations with the shoppers who use it, and Instacart will have to manage on-call time and shopper access to the platform to control costs. *Id.* ¶ 29. For example, Instacart will have to limit the windows in which shoppers can access the platform. It may also need to require shoppers to accept all batches offered to them or a minimum percentage of batches offered. *See id.* ¶¶ 30–31. In these ways, the new pay standard will dramatically restrict the flexible and open access to work that makes Instacart's platform attractive to shoppers, which will drive some shoppers away for good. *Id.* ¶¶ 41–44.

Likewise, these changes will damage Instacart's relationship, standing, and goodwill with consumers. If Instacart restricts the flow of shoppers onto the platform, it must by necessity also limit the availability of shoppers to meet consumer demand. With a smaller pool of shoppers, their deliveries will take longer and cost more. The result will be a slower, less flexible, and more expensive consumer experience, which will drive some consumers to look elsewhere. *See id.* ¶¶ 45–50. Similarly, retailers will be harmed by higher costs to consumers, which will depress demand and reduce revenue. *Id.* ¶ 51.

Local Law 124 was passed alongside four others. Local Law 107 mandates that Instacart provide two predetermined tipping options: a 10% option and a blank option, to be filled by the customer. *See* New York, N.Y., Local Law No. 107 § 1 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-107. That requirement will put Instacart in a bind. Instacart will need to raise delivery costs to consumers and be restricted

in how to offset those same costs. While Instacart might otherwise react by deemphasizing tips, which would relieve some consumer costs, these requirements will prevent it from doing so. Fees will rise, and consumers will still face prompts to provide an additional tip. The result will be higher costs and less demand overall.

Local Law 108 mandates that Instacart present these tipping options "in a conspicuous manner before or at the same time" as a customer places an order. New York, N.Y., Local Law No. 108 § 1 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-108. That requirement likewise limits Instacart's ability to respond to higher costs. Coupled with Local Law 107, it prevents Instacart from deemphasizing tips to offset higher delivery costs. It will therefore block Instacart from the most available strategy for offsetting costs, which will ultimately exacerbate the effect on consumers and the resulting effect on demand. Tandler Decl. ¶ 46.

Local Law 113 regulates the information and timing of Instacart's payments to shoppers. It requires Instacart to: (i) "pay all compensation, including any gratuity, owed to such contracted delivery worker for a pay period no later than 7 calendar days after the date on which such pay period ends"; and (ii) "provide each contracted delivery worker … a written statement … of all compensation owed to such contracted delivery worker for such pay period," which must "itemize all compensation and any permissible deductions or allowances." New York, N.Y., Local Law No. 113 § 1 (Aug. 12, 2025), https://intro.nyc/local-laws/2025-113. These requirements also force Instacart to redesign its interface, invest technical and

11

operational resources, and restructure its relationship with shoppers. Tandler Decl.
¶¶ 26, 37–39, 41.

Local Law 123 imposes a wide range of requirements on Instacart's operations,
ranging from recordkeeping to reporting. *See* New York, N.Y., Local Law No. 123
(Sep. 10, 2025), https://intro.nyc/local-laws/2025-123.

All these requirements were designed to target a small, identifiable group of
companies—most particularly Instacart. As the bills progressed, Instacart
representatives expressed their concerns. They emphasized that the minimum-pay
standard would saddle Instacart with a rule developed for the restaurant-delivery
platform industry, even though the grocery-delivery platform industry differs in
significant ways. Further, while a person of limited or fixed means might control
costs by eating fewer restaurant meals, they cannot so easily avoid buying groceries.
And if imposed, the package of bills would likely raise grocery costs. *See* Instacart
Public Testimony (Ex. D).

The Council made no responsive changes to the bills. Shortly before the bills'
hearing and vote, Introduction No. 1135-A's sponsor told reporters that she was
willing to sacrifice Instacart's business to make a political point: "Instacart is fighting
really hard to stop this legislation, but we did this because any business model that
is not able to survive a minimum pay rate is not a successful model." Nick Garber,
*Grocery Apps Object as NYC Council Closes "Instacart Loophole*, Crain's N.Y. Bus.
(July 14, 2025) (Ex. E). That is, the Council heard and heeded constituent calls to
"support local businesses, and not the giant corporations." *Hearing Testimony Before*

*the Comm. on Consumer & Worker Prot.* 71 (N.Y., New York, June 21, 2024) [hereinafter *June 21, 2024 Testimony*] (Ex. G); *see also id.* at 74, 76.

The Council passed all five bills on July 14, 2025. The Mayor then vetoed Introduction Nos. 1133-A and 1135-A, which included new pay standards for grocery-delivery workers and contracted delivery workers. On September 10, 2025, the Council voted to override the veto. All five Local Laws are now scheduled to take effect on January 26, 2026.

## LEGAL STANDARD

A preliminary-injunction movant must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm without preliminary relief, that the balance of equities favors relief, and that an injunction is in the public interest. *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.    Instacart is likely to succeed on the merits.

### A.    The FAAAA preempts the Local Laws.

The Local Laws are preempted by the FAAAA because they regulate the prices and services of Instacart shoppers, who are "motor carriers" under federal law. Congress adopted the FAAAA in 1994 as part of a broader effort to deregulate and reinvigorate the transportation industry. Like the Airline Deregulation Act (ADA), whose language it borrows, the FAAAA aims both to reduce federal regulation and to prevent a burdensome patchwork of state and local regulation. *See Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 436 (1st Cir. 2016). The goal is for transportation providers "to freely compete more efficiently and provide quality

service to their customers": "Service options will be dictated by the marketplace; and not by an artificial regulatory structure." H.R. Conf. Rep. 103-677, at 86 (1994). In other words, to foster "efficiency, innovation, and low prices," Congress commanded "maximum reliance on competitive market forces." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008) (citation omitted).

To that end, the FAAAA's preemption clause provides that a state or "political subdivision" thereof "may not enact or enforce" a law or regulation "related to a price, route, or service of any motor carrier." 49 U.S.C. § 14501(c)(1). A "motor carrier" is simply "a person providing motor vehicle transportation for compensation." *Id.* § 13102(14). And "transportation" includes any "motor vehicle, … instrumentality, or equipment of any kind related to the movement of … property"—plus any "services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of … property." *Id.* § 13102(23). Thus, if a state or local law relates to the prices, routes, services of a person who moves property in a motor vehicle for compensation (or provides related services), it is preempted. That broad standard applies here.

*First*, Instacart shoppers are motor carriers. Shoppers pick, pack, and deliver goods from local retailers to customers. They do so using motor vehicles, mainly cars. *See* Tandler Decl. ¶ 11. No more is required to trigger the FAAAA's broad language. Courts have held that the statute applies to independent contractors who "perform first-and-last mile pick-up and delivery services," *Schwann*, 813 F.3d at 438, to

independent couriers "chosen by bidding for routes in response to online advertisements," *Mass. Delivery Ass'n v. Healey*, 821 F.3d 187, 192–93 (1st Cir. 2016) ("*MDA*"), and to local tow trucks, *see Auto. Club of N.Y., Inc. v. Dykstra*, 520 F.3d 210, 214 & n.2 (2d Cir. 2008) (per curiam); *see also Ash v. Artpack Int'l, Inc.*, No. 96-cv-8440 (MBM), 1998 WL 132932, at *1, *5–6 (S.D.N.Y. Mar. 23, 1998) (company that plaintiff "hired to pack [her items] and transport them locally" provided "motor vehicle transportation," which "includes all 'services incident to carriage and delivery'" (citation omitted)).

*Second*, Local Laws 124, 107, 113, and 123 are "related to" Instacart shoppers' "price[s], route[s], or service[s]." 49 U.S.C. § 14501(c)(1). Congress used this language "to adopt the broad preemption interpretation" that the Supreme Court applied to the same language under the ADA. *Schwann*, 813 F.3d at 435–36 (cleaned up); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84 (1992). Thus, under the FAAAA, it is clear: "(1) that state [or local] enforcement actions *having a connection with, or reference to*, carrier rates, routes, or services are pre-empted; (2) that such pre-emption may occur even if a state law's effect on rates, routes, or services is only indirect; (3) that, in respect to pre-emption, it makes no difference whether a state law is consistent or inconsistent with federal regulation, and (4) that pre-emption occurs at least where state laws have a significant impact related to Congress' deregulatory and pre-emption-related objectives." *Rowe*, 552 U.S. at 370–71 (cleaned up). Under this expansive standard, the Local Laws are preempted.

Local Law 124 squarely regulates motor-carrier prices. It dictates that Instacart shoppers be paid set amounts determined under a regulatory standard. It thus prevents shoppers from charging less for their services or structuring their compensation differently. It therefore relates to their prices. *See ArcBest II, Inc. v. Oliver*, 593 F. Supp. 3d 957, 971–72 (E.D. Cal. 2022) (law allowing state agency to set "maximum and minimum rates" for household movers was preempted because it was "related to … prices and services").

Local Law 107 also relates to shoppers' prices and services. It dictates that customers be presented with two tipping options: a 10% option and a bespoke option. Shopper compensation for a given batch comprises the batch pay and tips from customers. *See* Tandler Decl. ¶ 15. Shoppers necessarily take tips into account when deciding whether a batch's pay is desirable. Tipping is inextricable from shopper compensation and a core part of their pricing. *Cf. DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 88 (1st Cir. 2011) (the ADA preempted a state tipping law, as applied to airport skycaps' tips, because it "directly regulates how an airline service is performed and how its price is displayed to customers"); *see also Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 852–53 (8th Cir. 2009) (state-law claims challenging a motor carrier's $10 rebilling fee were preempted because, while small, the fee was "part of its pricing and services").

Local Law 113 mandates that shoppers be paid for their services within seven days and requires itemized pay disclosures. By regulating the method and timing of payment, it relates to their prices. *See DiFiore*, 646 F.3d at 88 (preemption applied

because state tipping law affected the manner in which charges were disclosed and paid); *accord Brown v. United Airlines, Inc.*, 720 F.3d 60, 64 (1st Cir. 2013); *MDA*, 821 F.3d at 191 (state employee-classification law was preempted because it could affect the motor carrier's choices over routes to use or prices to charge).

Taking a broader view underscores that preemption applies. For one thing, by directly regulating prices, the Local Laws will also indirectly (but significantly) affect services. As the City's experience with restaurant-delivery providers shows, these requirements and restrictions will reduce the number of jobs in this area and affect shoppers' incentives whether to take batches or to deliver at all. *Cf. MDA*, 821 F.3d at 191–92 (by changing "who bears the economic risk associated with any inefficiencies in performance," state employee-classification law would affect delivery carriers' services (citation omitted)).

What's more, the package of Local Laws "substitutes New York's commands for competitive market forces," undermining Congress's goals of allowing market competition to set prices, spur innovation, and improve service. *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 223–24 (2d Cir. 2008) (per curiam). And in doing so, the Local Laws threaten precisely the "regulatory patchwork" that Congress sought to avoid. *Rowe*, 552 U.S. at 373. If New York can do this under the FAAAA, so can every other city in the country. That result would thwart innovation and impede efficient service, frustrating Congress's goals.

Finally, the Local Laws are nothing like the state or local regulations that escape preemption because they "affect rates, routes, or services in 'too tenuous,

remote, or peripheral a manner.'" *Id.* at 375 (citation omitted). For example, some courts conclude that the FAAAA does not preempt "*generally applicable background regulations* that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations." *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014) (emphasis added) (upholding generally applicable state meal and rest break law). That does not describe the Local Laws, which apply directly and only to a subset of motor carriers. And those same cases recognize that "[l]aws are more likely to be preempted when they operate at the point where carriers provide services to customers at specific prices." *Id.* That is precisely how the Local Laws operate. They are thus preempted as applied to Instacart shoppers.

B.    New York State law preempts the Local Laws.

New York State law independently preempts the Local Laws. "[T]he State Constitution establishes the state government as the preeminent sovereign of New York," and localities have lawmaking power "only to the extent it has been delegated by the State." *Baldwin Union Free Sch. Dist. v. County of Nassau*, 9 N.E.3d 351, 358–59 (N.Y. 2014) (citations omitted). New York's preemption doctrine is a "significant restriction" on those delegated powers and "embodies the untrammeled primacy of the Legislature to act with respect to matters of State concern." *People v. Diack*, 26 N.E.3d 1151, 1154 (N.Y. 2015) (citation modified).

Preemption under New York law generally "occurs in one of two ways—first, when a local government adopts a law that directly conflicts with a State statute and second, when a local government legislates in a field for which the State Legislature has assumed full regulatory responsibility." *Eric M. Berman, P.C. v. City of New York*,

770 F.3d 1002, 1005 (2d Cir. 2014) (quoting *DJL Rest. Corp. v. City of New York*, 749 N.E.2d 186, 190 (N.Y. 2001)); *see also Diack*, 26 N.E.3d at 1154 (preemption can occur through State's "enact[ment of] a comprehensive and detailed regulatory scheme in a particular area" or "the nature of the subject matter being regulated and the purpose and scope of the State legislative scheme, including the need for State-wide uniformity" (citations omitted)).

Here, a string of New York cases stretching back decades confirms that the Legislature intended to stake out—and thereby preempt—the field of labor law into which the City has injected itself, particularly with respect to the setting of minimum pay.

> 1. *Minimum-pay standards are the State's exclusive domain.*

The City's action here goes into the teeth of the State Legislature's work. In *Wholesale Laundry*, the First Department held—and the Court of Appeals affirmed—that the State's Minimum Wage Act preempted New York City's attempt to set a higher wage for local workers. *See* 17 A.D.2d at 329, *aff'd*, 189 N.E.2d 623. The court found it "entirely clear that the state law indicate[d] a purpose to occupy the entire field." *Id.* The restrictions in the Municipal Home Rule Law, which delegates certain powers to localities, on "any law that supersedes any provision of the labor law," the court observed, "indicate[d] a general state policy to make the provisions of that law free from interference by local authorities." *Id.* Further, the "Minimum Wage Law itself … formulate[d] an elaborate machinery for determining of an adequate wage." *Id.* That machinery includes varying the minimum wage based on locality. *See, e.g.*, *Minimum Wage*, N.Y. State Dep't of Lab., https://dol.ny.gov/minimum-wage (last

visited Nov. 21, 2025). The Court of Appeals and the Appellate Division have reaffirmed this holding several times since. *See, e.g.*, *Jancyn Mfg. Co. v. County of Suffolk*, 518 N.E.2d 903, 905 (N.Y. 1987); *Chwick v. Mulvey*, 81 A.D.3d 161, 167–68 (2d Dep't 2010).

These cases control here. The Municipal Home Rule Law still prohibits local legislation that "[a]pplies to or affects any provision of … the labor law." N.Y. Mun. Home Rule Law § 11(1)(f). And legislation addressing compensation plainly "affects" State labor law. *See* *Affect*, Oxford Eng. Dictionary (rev. 2008), https://tinyurl.com/2u4baxbh ("To have an effect on, either materially or otherwise."). As *Wholesale Laundry* makes clear, the rules governing the pay a worker receives is classically the domain of labor law. *See* 17 A.D.2d at 329; *see also Int'l Franchise Ass'n v. City of New York*, 193 A.D.3d 545, 546 (1st Dep't 2021) ("The Labor Law provisions were promulgated to protect workers and ensure their adequate and fair compensation.").

Consistent with this, just two years ago, the Legislature enacted the Freelance Isn't Free Act to supplement the existing statutory scheme and fully cover the waterfront. Among other things, the statute establishes when freelancers must be paid, and it prescribes that a contract between the freelancer and the hiring party be in writing and the required content of the contract. *See* N.Y. Gen. Bus. Law §§ 1410–1415. Critically, the Legislature's express premise was that freelancers' compensation would be *contractually* established. *See id.* § 1411 (establishing rules for when "the *contracted* compensation shall be paid to a freelance worker" (emphasis

added)); *id.* § 1410(3) (requiring compensation to be at least $800 in definition of "freelance worker"). And it expressly *required* that the contract include terms on "the rate and method of compensation." *Id.* § 1412(2)(b).

The "statutory history" of the Freelance Isn't Free Act confirms that the Act is part of a comprehensive scheme to govern the State's labor economy. *Cohen v. Bd. of Appeals*, 795 N.E.2d 619, 623 (N.Y. 2003). The bill sponsor's memorandum stated that the Act addressed how "independent contractors" were "not protected by the same minimum wage laws as regular employees." Senate Introducer's Mem. in Support, Bill Jacket, L. 2023, ch. 678, https://shorturl.at/AXBLx (Ex. F). Indeed, "[m]uch of the language" for the bill was "drawn from existing language in Article 6 [of the Labor Law] that provides wage theft protections for traditional employees," and the bill was *designed* to "creat[e] parity between the two different types of laborers" in the specified respects. *Id.*; *see Cohen*, 795 N.E.2d at 623 (using sponsor's memorandum to support preemption holding).

Consistent with all of this, the Act itself was expressly designed to be preemptive. It includes an extremely limited savings clause, stating that it "shall not be construed or interpreted to override or supplant any of the provisions of chapter ten of title twenty of the administrative code of the city of New York." N.Y. Gen. Bus. Law § 1415(5). The implication is that the Legislature knew full well how to give the City or other municipalities other room to navigate in this space, but it elected not to do so.

>    *2.   Other provisions likewise implicate State preemption.*

The rest of the Local Laws also are preempted because the City has improperly injected itself into the State's comprehensive scheme for laborers.

*First*, Local Laws 107 and 108, which establish tipping rules for grocery-delivery workers, are preempted for similar reasons as Local Law 124. As discussed *supra* Section I.A, at 16–17, tipping is intertwined with compensation, and setting pay standards for the State's workers is a task for the Legislature, not the City, *see supra* Section I.B.1. The Minimum Wage Act specifically covers tipping in regulating the compensation of covered employees. *See* N.Y. Lab. Law §§ 650–665. Local Laws 107 and 108 improperly attempt to countermand the State's determinations.

*Second*, Local Law 113, which requires paying grocery-delivery workers within seven days of their services and providing them itemized disclosures of their compensation, intrudes on State provisions controlling the same subject. The Freelance Isn't Free Act already says that the parties' contract must provide for "the date on which the hiring party must pay the contracted compensation or the mechanism by which such date will be determined." N.Y. Gen. Bus. Law § 1412(2)(c). The statute further requires payment on the date the contract specifies or, if there is no date, within thirty days of when the contracted-for services are rendered. *See id.* § 1411(1). Local Law 113 would override these provisions, thus "frustrat[ing]" the Legislature's desire to allow parties to contract for the terms of their relationship. *Consol. Edison Co. of N.Y., Inc. v. Town of Red Hook*, 456 N.E.2d, 487, 490 (N.Y. 1983).

*Third*, Local Law 123, which imposes, *inter alia*, certain recordkeeping and reporting requirements, also subverts those in the Freelance Isn't Free Act. That statute requires hiring parties to retain contracts for six years and make them available upon request to the Attorney General, who can also investigate alleged violations and bring enforcement actions. *See* N.Y. Gen. Bus. Law §§ 1412(3), 1414(1). Yet Local Law 123 would require additional recordkeeping and disclosures to City enforcement officials, thus "frustrat[ing]" the Legislature's goals and making State law redundant. *Consol. Edison*, 456 N.E.2d at 490-91 ("In light of this pre-emption, defendants had no power to adopt additional requirements or require additional permits relating to such siting."); *see also Penny Lane/E. Hampton, Inc. v. County of Suffolk*, 191 A.D.2d 19, 27 (2d Dep't 1993) ("If the State has preempted the field, even duplications or consistent enactments are beyond a local government's powers." (citation omitted)).

C.   The Local Laws discriminate against interstate commerce in violation of the dormant Commerce Clause.

The Local Laws violate the dormant Commerce Clause by discriminating against interstate commerce. *See* U.S. Const. art. I, § 8, cl. 3; *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 368 (2023) (explaining the clause's "negative command, … effectively forbidding the enforcement of certain state economic regulations even when Congress has failed to legislate on the subject" (citation modified)). The dormant Commerce Clause forbids "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 369. A law need not "discriminate against interstate commerce

'on its face'" to violate the Constitution. *Variscite NY Four, LLC v. N.Y.S. Cannabis Control Bd.*, 152 F.4th 47, 63 (2d Cir. 2025) (citation omitted) (holding New York marijuana dispensaries licensure procedure violated the dormant Commerce Clause). Rather, a law also is unconstitutional where it "harbor[s] a discriminatory purpose" or "discriminate[s] in its effect." *Id.* (citation omitted); *see Nat'l Pork Prods.*, 598 U.S. at 377 ("[A] law's practical effects may also disclose the presence of a discriminatory purpose").

Here, the Local Laws discriminate against interstate commerce in purpose and effect. Parochialism pervades the Local Laws. They are defined to govern only *certain* grocery delivery services and workers. They cover a "[t]hird-party grocery delivery service," which "means any website, mobile application, or other internet service that: (i) facilitates, offers or arranges for the delivery of goods from a retail food establishment; and (ii) *is owned or operated by a person other than the person who owns such retail food establishment.*" Local Law 124 No. § 2 (emphasis added). "Grocery delivery worker" encompasses only those "retained by a third-party grocery delivery service." *Id.*[3]

Thus, the Local Laws impose special burdens on out-of-state companies like Instacart, while exempting entities with a local retail presence even if they offer identical grocery delivery services. That is, the Laws apply to Instacart, which does not own any retail food establishment from which shoppers deliver goods to City

---

[3] The Laws also cover only trips that start, stop, or involve pickup from an establishment in the City—a geographic limitation that, in practical terms, confirms that the "owned by" exemption is limited to entities that own local retailers. *See* Local Law 123 No. § 1, sec. 20-1521(e).

consumers. But the Laws would *not* apply if the very same retail food establishment operated a website allowing customers to arrange delivery of the very same goods. Indeed, because shoppers are independent contractors, the very same shopper could make the very same delivery to the very same consumer, but the obligations owed to that shopper would vary simply based on whether a consumer placed the order through Instacart or the retail establishment's own website.

The net result is to exclude retailers in the City from regulatory burdens while hamstringing only out-of-state companies. Use of such "prox[ies] and correlative[s]" for local and non-local is a telltale sign of "discriminat[ion] against out-of-staters." *Variscite NY Four*, 152 F.4th at 63. Indeed, the disparity between how the Local Laws treat an entity like Instacart[4] and a business like the one described above broadly implicate the factors that courts consider in determining whether "a law discriminates against interstate commerce in practical effect," namely "whether that law would 'increase costs for a particular type of business model, create barriers to entry, raise labor costs in a way that will impact the flow of interstate commerce, cause franchisees to close or reduce operations, or generally affect interstate commerce.'" *Rest. L. Ctr. v. City of N.Y.*, 90 F.4th 101, 119 (2d Cir. 2024) (citation omitted). Here, as shown above, the Law would: (1) increase costs for a particular type of business model like that of Instacart which lacks retail establishments in the City; (2) create barriers to entry for other businesses like Instacart; (3) raise labor

---

[4] We are unaware of any New York entity with a business model like Instacart's, nor is one considered in the Local Laws' legislative history. A leading competitor in this space, Shipt, also is based outside of New York.

costs for Instacart, whose shoppers would be deemed "grocery delivery worker[s]," and become more expensive whereas retailers' similar contractors would not; and (4) threaten to cause such businesses to close or reduce operations insofar as they may become price prohibitive for consumers.

Further, the discriminatory effects on businesses like Instacart—and discriminatory benefits to local businesses that have or may decide to launch delivery services—are "not an unintended byproduct." *Variscite NY Four*, 152 F.4th at 64 (citation omitted). This discriminatory purpose is reflected throughout the City Council record. The Council singled out by name a small number of third-party platform operators, including Instacart. *See supra* p.9. None has its headquarters in New York, and none operates a retail outlet in the City. The legislative record further shows that the Council was responding to constituent cries to "support local businesses, and not the giant corporations." *June 21, 2024 Testimony* 71; *see also id.* at 74, 76 (similar). Given their discriminatory purposes, the Local Laws are "per se invalid unless the government has 'no other means to advance a legitimate local purpose.'" *Variscite NY Four*, 152 F.4th at 63 (quoting *Rest. L. Ctr.*, 90 F.4th at 118). The City plainly can't meet that burden.

## II.    Instacart will suffer irreparable harm without an injunction.

The Local Laws will irreparably harm Instacart if preliminary injunctive relief is not granted. First, they will harm the reputation and goodwill that Instacart has built over years with shoppers and consumers on its platform, thereby driving them away—even permanently—from the platform. The Local Laws here seek to do nothing short of radically transforming Instacart's business model from the one that

has made it so successful, depriving shoppers of the flexibility on which they depend. Second, they risk imposing nonrecoverable monetary harms, since Instacart has no federal cause of action for money damages against the City on its preemption claims. Third, as a constitutional injury, the dormant Commerce Clause violation is presumptively irreparable.

A.    <u>Harm to reputation, goodwill, and business model</u>

The Local Laws threaten Instacart with injuries that no damages award can repair, including the loss of goodwill and reputation with the shoppers and customers that are intrinsic to the platform as designed and make it thrive. *See Jacobson & Co. v. Armstrong Cork. Co.*, 548 F.2d 438, 445 (2d Cir. 1977) ("a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages"); *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (similar). Damages are an inadequate remedy when "the loss is difficult to replace or measure." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). And injury to "reputation and good will" is often "nearly impossible to value." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990). Indeed, as described above, the Local Laws stand to dismantle the platform as it is currently understood, including undoing what has made Instacart's relationships with shoppers (and, in turn, consumers) so successful. Tandler Decl. ¶¶ 40–54; *see Tom Doherty Assocs.*, 60 F.3d at 35–37 ("We have also found irreparable harm in the loss of a relatively unique product."); *WPIX*, 691 F.3d at 286 (finding irreparable harm where conduct to be restrained "would drastically change the industry, to plaintiffs' detriment").

Instacart's business depends on the flexibility, independence, and convenience

that its platform offers. Tandler Decl. ¶¶ 24, 40–42. Today, shoppers enjoy an open, on-demand platform where they have the right to choose when, where, and how to work. *See id.* ¶¶ 16–17. The platform's independence and flexibility are precisely why shoppers choose to be Instacart's partners. *See id.*; *Understanding the Shopper Community: A Report*, Instacart (June 8, 2023) (reporting that more than 80% of shoppers said they used Instacart because of the "independence" it offered them, while 75% said that "flexibility" was "the main reason they shop"), https://shorturl.at/2wBF. In turn, customers have come to associate Instacart with broad selection, convenient delivery windows, and shoppers who know their customers and how to navigate local markets for them. Instacart has spent years studying these issues and constructing this framework, including by carefully balancing the interests and incentives of shoppers, consumers, and retailers. Tandler Decl. ¶ 24. Thousands of personnel have worked on the Instacart marketplace to make the platform a success. *See id.*

The Local Laws directly imperil these features that are central to the platform's success. To manage now-compensable "trip time" and "waiting time," Instacart will have to abandon its open model and lock access behind a virtual wall, admitting only as many shoppers as ever-changing demand supports and requiring shoppers to accept available batches. *See id.* ¶¶ 28–31. That is, shoppers' freedom to work on their own terms—the very thing that attracts them to the Instacart platform—would vanish. Many shoppers will find that they are barred from accessing the platform at all, never mind still having the discretion to choose among batches,

when they want to do so. *See id.* ¶ 31. Many surely will leave the platform as a result. *See id.* ¶¶ 41–44. Moreover, customers will see higher fees, fewer options, and worse service as a consequence. *See id.* ¶ 45. They too may leave the platform as a result. No court order could later undo all these types of harm. *See, e.g.*, *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (finding irreparable harm because, among other things, "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come"); *Reuters*, 903 F.2d at 908 (recognizing that a newspaper's loss of readership is irreparable).

The likelihood of such harms is borne out by the City's past experience with restaurant-delivery platforms. When the City imposed a pay mandate in that context, almost 40% of the workers previously registered as delivery workers stopped working in the industry. *See 2024 Delivery App Data*, at 3. The platforms predictably had to hike consumers' fees—by about 60%—and overall prices rose by about 10%. *Id.*; *see also Council for Responsible Nutrition v. James,* — F.4th — , 2025 WL 3165673, at *11 (2d Cir. Nov. 13, 2025) ("Unrecoverable lost sales … can constitute irreparable harm."). Instacart's harm is likely to be even more severe. Whereas the restaurant-delivery regulations were tailored to the industry's economics and business model, the City has never studied this one and instead would simply import that bespoke model to grocery-delivery platforms.

### B.   No damages cause of action

Without preliminary relief, Instacart will also likely suffer irreparable harm by incurring unrecoverable compliance costs because it lacks a federal cause of action

for money damages against the City. Irreparable harm is "harm shown to be non-compensable in terms of money damages." *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004) (citation omitted).

The Second Circuit has recognized that a plaintiff suffers "irreparable business damages" if "the available federal legal remedies" for the state's prohibited conduct do not include damages. *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (emphasis omitted); *accord Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013). As other courts have summarized, if a plaintiff is limited "to seeking nonmonetary equitable relief"—meaning any monetary losses are "unrecoverable"—then "these losses can constitute irreparable harm." *Perkins Coie LLP v. Dep't of Just.*, 783 F. Supp. 3d 105, 178 (D.D.C. 2025) (citation modified) (collecting cases), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025); *see also Regeneron Pharms., Inc. v. Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020) (collecting cases).

Instacart's FAAAA claim does not allow for damages. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (applying *Ex parte Young*, and recognizing "relief may be given in a court of equity to prevent an injurious act by a public officer," so "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted" (citation omitted)); *see also UnitedHealthcare of N.Y., Inc. v. Lacewell*, 967 F.3d 82, 90 (2d Cir. 2020). There is also no indication that the state-law claim permits damages. "[G]overnmental entities … continue to enjoy … a

significant measure of immunity fashioned for their protection by the courts" of the State. *Haddock v. City of New York*, 553 N.E.2d 987, 990–91 (N.Y. 1990). Thus, "when official action involves the exercise of discretion or expert judgment in policy matters, … a municipal defendant generally is not answerable in damages …." *Id.* The Local Laws fit that bill. *See, e.g.*, *B & J Invs. Corp. v. Town Bd.*, 56 A.D.2d 882, 882 (2d Dep't 1977) (finding municipality's enactment of a regulation meant it "has immunity which rests upon 'a regard for sound principles of government administration and a respect for the expert judgment of agencies authorized by law to exercise such judgment.'" (citation omitted)).

Here, in order to comply with the Local Laws, Instacart must undertake extensive and costly changes to its platform and underlying operations. *See* Tandler Decl. ¶¶ 26, 37–39. The required changes range from reengineering its platform to track "on-call" and "trip" time and utilization rates to redesigning the Shopper App to manage and restrict access windows, implementing systems to ensure aggregate minimum pay to revising its tipping interface. *See id.* ¶ 37. All these changes will require the diversion of thousands of hours of scarce engineering time over a short timespan, plus ongoing monitoring, reporting, and enforcement costs. *See id.* ¶ 38. There also are immense associated opportunity costs, including lost innovation, delayed product improvements, and the nonquantifiable permanent restructuring of Instacart's relationships with shoppers, consumers, and retailers as they adjust their behavior in response to the new regime. *See id.* ¶ 39. These harms are overwhelmingly nonquantifiable. Because Instacart has no federal cause of action

that would allow it to recover these costs from the City, they are unrecoverable as a matter of law and therefore constitute irreparable harm.

      C.   <u>Constitutional violation</u>

Finally, the dormant Commerce Clause violation is an irreparable injury. Violations of constitutional rights are presumptively irreparable, *see Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996), and "no separate showing of irreparable harm is necessary," *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999); *see also Amazon.com Servs. LLC v. N.Y. State Pub. Emp. Rels. Bd.*, No. 25-cv-5311, 2025 WL 3295071, at *5 (E.D.N.Y. Nov. 26, 2025) (finding irreparable harm where federal law preempted state employment law). The Commerce Clause doesn't just "confer power on the Federal Government"; it also "confer[s] a 'right'" to be free from certain restrictive state regulation. *Dennis v. Higgins*, 498 U.S. 439, 447–48 (1991) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 326 (1979)). Thus, the "[d]eprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury." *Am. Librs. Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997); *see also*, *e.g.*, *C & A Carbone, Inc. v. Town of Clarkstown*, 770 F. Supp. 848, 854 (S.D.N.Y. 1991).

*    *    *

The Local Laws will harm Instacart immediately and indelibly. The only way to prevent these harms is for the Court to act now.

## III.  **Equity and the public interest favor a preliminary injunction.**

The public interest and equities favor relief. The Local Laws intrude on the federal and New York State governments' exclusive authority and further violate the

dormant Commerce Clause. As explained, Instacart will suffer irreparable injury without an injunction, including to its constitutional rights. And shoppers stand to lose opportunities, consumers stand to lose a service or pay a higher price for it, and retailers stand to lose business. Regardless, neither the City nor the public has an interest in enforcing a preempted or unconstitutional law. *See, e.g.*, *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 403 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023). Rather, "there can be no doubt that the public interest favors requiring the government to comply with the law." *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 61 (S.D.N.Y. 2025) (citation omitted).

## CONCLUSION

For these reasons, the Court should enjoin the Local Laws' enforcement against Instacart.

December 2, 2025                                Respectfully submitted,

                                               */s/ Eamon P. Joyce*

Eli Freedberg                                  Eamon P. Joyce
Michael Paglialonga                            SIDLEY AUSTIN LLP
LITTLER MENDELSON, P.C.                        787 Seventh Avenue
290 Broadway Road, Suite 305                   New York, NY 10019
Melville, NY 11747                             212.839.5300
631.247.4713                                   ejoyce@sidley.com
efreedberg@littler.com
mpaglialonga@littler.com
                                               Tobias S. Loss-Eaton
                                                  (admission pending)
Alexander T. MacDonald                         Jacob Steinberg-Otter
   (*pro hac vice* movant)                        (admission pending)
James A. Paretti, Jr.                          SIDLEY AUSTIN LLP
   (*pro hac vice* movant)                     1501 K Street NW
LITTLER MENDELSON, P.C.                        Washington, DC 20005
815 Connecticut Ave., NW                       202.736.8000
Washington, DC 20006                           tlosseaton@sidley.com

202.842.3400                                    jacob.steinbergotter@sidley.com
amacdonald@littler.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of December, 2025, I electronically filed the foregoing with the Clerk of the Court by using the ECF system, and I served the foregoing by email on ServiceECF@law.nyc.gov and will serve same by hand delivery.

*/s/ Eamon P. Joyce*
Eamon P. Joyce

## CERTIFICATE OF WORD COUNT

I certify that the qualifying portions of the foregoing memorandum of law contains 8,689 words and therefore complies with Local Rule 7.1(c).

*/s/ Eamon P. Joyce*
Eamon P. Joyce