**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**MAPLEBEAR INC.,**

                **Plaintiffs,**

      **- against –**

**CITY OF NEW YORK, ET AL.,**

                **Defendants.**

**25-cv-9979 (JGK)**

**MEMORANDUM OPINION AND ORDER**

---

**JOHN G. KOELTL, District Judge:**

The plaintiff, Maplebear Inc., which does business as "Instacart," brings this action against the defendants, the City of New York and the New York City Department of Consumer and Worker Protection.[1] Instacart alleges that a package of local laws intended to regulate third-party grocery-delivery services are unlawful because they are preempted by both federal law and state law, and because they violate the dormant Commerce Clause of the United States Constitution.

Instacart moves pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction prohibiting the defendants from enforcing these laws, which go into effect on

---

[1] The complaint also names as a defendant Vilda Vera Mayuga in her official capacity as Commissioner of the New York City Department of Consumer and Worker Protection. Compl. ¶ 20. However, since Instacart filed its complaint, Mayuga has been replaced as the Commissioner of the Department of Consumer and Worker Protection by Samuel A. A. Levine. Levine is therefore "automatically substituted" for Mayuga pursuant to Federal Rule of Civil Procedure 25(d); see also Tanvir v. Tanzin, 894 F.3d 449, 459 n.7 (2d Cir. 2018) ("[I]f the defendant in an official capacity suit leaves office, the successor to the office replaces the originally named defendant."), aff'd, 592 U.S. 43 (2020).

January 26, 2026. For the following reasons, the plaintiff's motion for a preliminary injunction is **denied.**

### I.

Based on the submissions of the parties, the Court finds the following facts and reaches the following conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2).

### A.

Instacart is a technology company that operates a digital platform allowing consumers to arrange for grocery shopping and other delivery services through a web page or smartphone application. Those shopping and delivery services are provided by independent shoppers with whom Instacart contracts ("Shoppers").

Like consumers, Shoppers can access Instacart's digital platform through a smartphone application. Shoppers can see orders placed by nearby consumers and choose which orders to shop for and deliver. Instacart refers to these orders as "batches." Declaration of Jacqueline Tandler ("Tandler Decl.") ¶ 5, ECF No. 9. Shoppers are not required to fulfill any particular batch or number of batches. Id. ¶¶ 6-7. Shoppers can instead browse batches through the smartphone application and choose to accept as many or as few batches as they wish. Id.

Most batches are orders for groceries. Because grocery orders often involve many items, Instacart represents that more than ninety-nine percent of its Shoppers in New York City

between June and December 2025 used full-sized motor vehicles to complete their deliveries. Id. ¶ 11. Furthermore, roughly ninety percent of batches in New York City are offered only to those Shoppers registered with four-wheel vehicles. Id.

Instacart pays its Shoppers a guaranteed fixed price called "batch pay." Id. ¶ 13. The Shopper can see the batch pay through Instacart's smartphone application before accepting a batch. Id. ¶ 14. By accepting a batch, a Shopper agrees to complete the batch in exchange for the offered batch pay. In turn, Instacart agrees to pay the Shopper within thirty days. Declaration of Eamon P. Joyce ("Joyce Decl."), Ex. A ¶ 3.1, ECF No. 10-1. Instacart's platform also includes an optional tipping tool that allows customers to pay Shoppers a gratuity on top of their batch pay. Tandler Decl. ¶ 15.

According to Instacart, Shoppers "rely on the flexibility and independence that Instacart's platform offers," and its research shows that "a large majority of [S]hoppers choose Instacart primarily because it allows them to choose which batches to accept and decide when and where to work."[2] Id. ¶ 16. Shoppers "thus fit Instacart work around their individual schedules including caregiving, schooling, and other obligations." Id. Instacart's internal research bears this out:

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

seventy-five percent of Shoppers indicated that they chose to work for Instacart because of the "flexibility" it provides and Shoppers "average fewer than 10 hours per week working on Instacart." Id. (citing Instacart, Economic Impact Report 18 (2025), https://shorturl.at/Ojdxf).

**B.**

On April 29, 2021, the New York City Council introduced Intro. No. 2294, which would require the Department of Consumer Welfare and Protection (the "Department") "to study the working conditions of third party food delivery workers" and to "promulgate rules establishing the minimum per trip payment that must be made to third party food delivery service workers." Declaration of Samantha Schonfeld ("Schonfeld Decl."), Ex. 22, ECF No. 31-22. The Council ultimately passed the measure on October 25, 2021, which was enacted as Local Law 115 of 2021.

In November 2022, the Department published a report summarizing the results of its study. Id. Ex. 28. The Department found that food-delivery workers earned $7.09 per hour without tips, and $4.03 per hour without tips after adjusting for job-related expenses. Id. at 17–18, 21. Based on these findings, the Department proposed a Minimum Pay Rule ("MPR"), which would require that food-delivery workers be paid an average minimum pay rate of $23.82 per hour. Id. Ex. 29. After amendments, the final version of the MPR established a minimum pay rate starting

at $17.96 per hour and gradually increasing to $19.96 per hour, plus adjustments for inflation, by April 1, 2025. Id. Ex. 30.

In late 2024, the City Council decided to extend the minimum-pay regime to so-called third-party grocery-delivery services. On December 5, 2024, the Council introduced Intro. Nos. 1133 and 1135. Intro. No. 1133 would require delivery services to "retain records documenting [their] compliance with the applicable requirements of this chapter for a period of 3 years." Id. Ex. 17. Intro. No. 1135 "would require third-party grocery delivery services to pay their grocery delivery workers a minimum pay rate that would meet or exceed the minimum pay rate established by [the Department] that must be paid to food delivery workers." Id. Ex. 19.

The Council passed amended versions of both measures with a veto-proof majority on July 14, 2025. Id. Ex. 20. On August 13, 2025, Mayor Eric Adams vetoed the measures. Id. Ex. 24. On September 10, 2025, the Council voted to override the Mayor's veto and Intro. Nos. 1133-A and 1135-A became Local Laws 123 and 124 of 2025. Id. Exs. 6 & 7.

The Council enacted three other regulations governing delivery workers. First, the Council introduced Intro. No. 737, which "would require third-party food delivery services, such as Uber Eats and Seamless, to suggest gratuity at a minimum of 10 percent of the purchase price on each food delivery order." Id. Ex. 9. Second, the Council introduced Intro. No. 738, which

"would require third-party food delivery services that solicit gratuities for food delivery workers to conspicuously solicit gratuities before or at the same time an online order is placed." Id. Ex. 12. Finally, the Council introduced Intro. No. 859, which would require delivery services to provide workers with "information underlying their pay calculations." Id. Ex. 15. The Council later amended Intro. Nos. 737, 738, and 859 to include grocery-delivery services, as well. Id. Exs. 10, 13, 16. The Council passed these measures on July 14, 2025, which were returned unsigned by the Mayor on August 12, 2025. Intro. Nos. 737-A, 738-A, and 859-A became Local Laws 107, 108, and 113 of 2025, respectively. Id. Exs. 3, 4, 5.

Several months later, on December 2, 2025, Instacart brought this action and moved for a preliminary injunction barring the defendants from enforcing all five of the local regulations (the "Local Laws"), which are set to go into effect on January 26, 2026.

## II.

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007). To obtain a preliminary injunction, the plaintiff must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an

injunction is in the public interest. See <u>Winter v. Nat. Res.</u>
<u>Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008).

When the moving party seeks an injunction that will affect
government action taken pursuant to a regulatory scheme, the
plaintiffs must establish a "clear or substantial" likelihood of
success on the merits. <u>Sussman v. Crawford</u>, 488 F.3d 136, 140
(2d Cir. 2007) (per curiam). This heightened requirement
reflects the principle that policies implemented through the
legislative process are entitled to a "higher degree of
deference and should not be enjoined lightly." <u>Able v. United</u>
<u>States</u>, 44 F.3d 128, 131 (2d Cir. 1995).

### III.

According to Instacart, the Local Laws are invalid for
three reasons. First, Instacart argues that the Local Laws are
preempted by the Federal Aviation Administration Authorization
Act of 1994 (the "FAAAA"), which forbids state and local
governments from enacting or enforcing any "law ... related to a
price, route, or service of any motor carrier ... with respect
to the transportation of property." 49 U.S.C. § 14501(c)(1).
Second, Instacart contends that various state statutes preempt
the Local Laws. And finally, Instacart claims that the Local
Laws discriminate against out-of-state businesses in violation
of the dormant Commerce Clause.

**A.**

Under the Supremacy Clause, "the Laws of the United States" made "in Pursuance" of the Constitution "shall be the supreme Law of the Land ... [the] Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "A corollary of the Supremacy Clause is the doctrine of preemption, under which Congress may 'exercise its constitutionally delegated authority to set aside the laws of a State.'" Buono v. Tyco Fire Prods., LP, 78 F.4th 490, 495 (2d Cir. 2023) (quoting Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 30 (1996)). When federal law preempts nonfederal law, "the Supremacy Clause requires courts to follow federal, not state, law." Id.; see also Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 82 (1824) ("[T]he act of Congress ... is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it.").

In 1978, Congress "determined that maximum reliance on competitive market forces would favor lower airline fares and better airline service, and it enacted the Airline Deregulation Act." Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 367–68 (2008). To "ensure that the States would not undo federal deregulation with regulation of their own," the statute "included a pre-emption provision" providing that states are prohibited "from enforcing any law relating to rates, routes, or

services of any air carrier." Morales v. Trans World Airlines,
Inc., 504 U.S. 374, 378-79 (1992).

In 1980, Congress decided to extend its deregulatory policy
from aviation to trucking by passing the Motor Carrier Act of
1980, Pub. L. No. 96-296, 94 Stat. 793. "And a little over a
decade later, in 1994, Congress similarly sought to pre-empt
state trucking regulation." Rowe, 552 U.S. at 368. Congress thus
passed the FAAAA, Pub. L. No. 103-305, 108 Stat. 1605-06, which,
borrowing from the Airline Deregulation Act, provides that "a
State [or] political subdivision ... may not enact or enforce a
law ... related to a price, route, or service of any motor
carrier ... with respect to the transportation of property." 49
U.S.C. § 14501(c)(1).

As relevant here, when "a federal law contains an express
preemption clause," courts "focus on the plain wording of the
clause, which necessarily contains the best evidence of
Congress'[s] preemptive intent." Buono, 78 F.4th at 495.
Although courts ordinarily interpret congressional statutes in
light of a presumption against preemption, courts do not
"'invoke any presumption against pre-emption' when a statute
contains an express-preemption clause." Id. (quoting Puerto Rico
v. Franklin Cal. Tax-Free Tr., 579 U.S. 115, 125 (2016)). That
"a federal law contains an express pre-emption clause ... does
not immediately end the inquiry," however, "because the question
of the substance and scope of Congress'[s] displacement of state

law still remains." <u>Altria Grp., Inc. v. Good</u>, 555 U.S. 70, 76 (2008).

In this case, Instacart argues that the FAAAA's express-preemption provision displaces the Local Laws. To establish that the FAAAA's express preemption provision applies, Instacart must show first that the Local Laws relate to "motor carriers" and, second, that the Local Laws "relate[] to a price, route, or service" of those motor carriers "with respect to the transportation of property." 49 U.S.C. § 14501. Instacart's claim is likely to fail at both steps.

The FAAAA defines a "motor carrier" as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). According to Instacart, its Shoppers "are motor carriers" because they "pick, pack, and deliver goods from local retailers to customers," and they "do so using motor vehicles, mainly cars." Pl.'s Mot. Prelim. Inj. ("Mot.") 8, ECF No. 8; <u>see also</u> Tandler Decl. ¶ 11.[3] Although Instacart does not require that its Shoppers use cars — or any particular mode of transportation for that matter — Instacart claims that the vast majority of Shoppers in New York City use cars. Tandler Decl. ¶ 11; <u>see also</u> Tr. 4:17–23.

---

[3] Instacart contends that it is not a motor carrier, and the defendants do not dispute that claim at this stage. The Court therefore assumes without deciding that Instacart is not a motor carrier.

The FAAAA, however, exempts from its definition of "motor carriers" "transportation by motor vehicle provided casually, occasionally, or reciprocally but not as a regular occupation or business." 49 U.S.C. § 13506(b)(2). Instacart itself explains that a "large majority of shoppers choose Instacart" because its flexibility allows them to "work around their individual schedules, including caregiving, schooling, and other obligations." Tandler Decl. ¶ 16. In one 2025 report compiled by Instacart, "75% of surveyed shoppers indicated they choose to work with Instacart because of the 'flexibility' it provides." Id. (citing Instacart, Economic Impact Report 18 (2025), https://shorturl.at/Ojdxf). The same study showed that "surveyed shoppers average[d] fewer than 10 hours per week working on Instacart." Id. "Because of this flexibility and independence, shoppers who use Instacart in New York City are often women, caregivers, and/or people working part-time or around other responsibilities." Id. ¶ 17.

Far from establishing that Shoppers qualify as motor carriers, Instacart's own submissions tend to show that Shoppers fall within one of the statute's express exemptions. Indeed, it is difficult to imagine that Congress, which enacted the FAAAA to "extend[] deregulation to the trucking industry," Dan's City Used Cards, Inc. v. Pelkey, 569 U.S. 251, 256 (2013), intended to cover persons who independently provide local deliveries for a few hours a week using the family car. See, e.g., Costello v.

BeavEx, Inc., 810 F.3d 1045, 1051 (7th Cir. 2016) ("[T]o complete deregulation of the trucking industry, Congress enacted a preemption provision in the [FAAAA]."); Bedoya v. Am. Eagle Express Inc., 914 F.3d 812, 818 (3d Cir. 2019) ("Congress enacted similar laws focused on deregulating interstate trucking, culminating with the passage of the FAAA in 1994.").

Instacart's argument at the second step of the FAAAA analysis — that the Local Laws relate to prices, routes, or services — also faces significant obstacles. "The phrase 'related to' ... embraces state laws having a connection with or reference to carrier rates, routes, or services, whether directly or indirectly." Dan's City, 569 U.S. at 260. However, "the breadth of the words 'related to' does not mean the sky is the limit." Id. The Supreme Court has cautioned against reading the phrase "with an uncritical literalism, else for all practical purposes pre-emption would never run its course." Id. The Court has explained, for example, that "§ 14501(c)(1) does not preempt state laws affecting carrier prices, routes, and services in only a tenuous, remote, or peripheral manner." Id. at 261. "In this vein, the Supreme Court's decisions about [FAAAA] preemption after Morales have tended to construe the [FAAAA] narrowly, holding, for instance, that a state law is 'related to' prices, routes, and services if it 'aim[s] directly at the carriage of goods' and requires motor carriers 'to offer a system of services that the market does not now provide,' or

'freeze[s] into place services that carriers might prefer to discontinue in the future.'" Cal. Trucking Assoc. v. Bonta, 996 F.3d 644, 656 (9th Cir. 2021) (quoting Rowe, 552 U.S. at 372, 376).

"[A] law does not have a binding or freezing effect, and thus is not preempted, merely because a motor carrier must take the law into account when making business decisions, or merely because the law increases a motor carrier's operating costs." Id. at 658. Rather, to have a binding or freezing effect, a law must "compel[] a result at the level of the motor carrier's relationship with its customers or consumers." Id. Courts have thus almost uniformly held that generally applicable background regulations, such as labor and wage laws, are not preempted by the FAAAA, even if those regulations have downstream effects on customer prices, because they regulate the motor carrier "at the level of [the] motor carrier's relationship with its workforce." Id. at 659; see also Costello, 810 F.3d at 1057 (Illinois law requiring motor carrier to treat couriers as employees rather than independent contractors was not preempted by FAAAA); Bedoya, 914 F.3d at 826 ("Congress sought to ensure market forces determined prices, routes, and services. Nothing in that goal, however, meant to exempt workers from receiving proper wages, even if the wage laws had an incidental impact on carrier prices, routes, or services."); Dilts v. Penske Logistics, LLC, 769 F.3d 637, 646 (9th Cir. 2014) ("[G]enerally applicable

background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about the prices that they set, the routes that they use, or the services that they provide.").

Instacart resists this conclusion by arguing that cases like Bonta and Costello are distinguishable. In Instacart's view, the Local Laws in this case do not regulate the relationship between motor carrier and employee, but rather directly regulate the motor carriers themselves — that is, the Shoppers. The Shoppers may want to sell their labor to Instacart, but the Local Laws effectively impose a price floor below which Shoppers cannot do so.[4]

This argument is unpersuasive because it does not focus on the effect the Local Laws have on prices "at the level of the motor carriers' consumers." Bonta, 996 F.3d at 658. Instacart instead takes issue with the prices that the Shoppers charge a digital platform that connects Shoppers to customers. But the prices that motor carriers charge intermediaries for their labor, rather than customers and consumers for their transportation services, is simply not what Congress intended to preempt with the FAAAA. See Cal. Trucking Assoc. v. Su, 903 F.3d

---

[4]    Instacart does not clearly explain how this argument would extend beyond Local Law 124.

953, 967 (9th Cir. 2018) ("[N]othing in the FAAAA's legislative history indicated that Congress intended to preempt the traditional power to protect employees or the necessary precursor to that power, i.e., identifying who is protected."). The Local Laws' effect on the relationship between Instacart and its Shoppers is more analogous to the effects of state regulations governing the relationship between firms and employees, which have long been held to be permissible under the FAAAA, rather than the relationship between the motor carrier and the ultimate consumer.

Because Instacart has failed to show that its Shoppers are motor carriers within the meaning of the FAAAA and because Instacart has failed to show that any of the Local Laws relate to the prices, routes, or services of motor carriers in the relevant sense, it is unlikely to succeed on the merits of its federal preemption claim.

**B.**

Instacart next contends that various provisions of state law preempt the Local Laws. The New York State constitution grants local governments the power to enact "local laws not inconsistent with the provisions of th[e] constitution or any general law" relating to specified subjects, including the "safety, health and well-being of [the local government's] persons or property." N.Y. Const., art. IX, § 2(c)(ii)(10); see also N.Y. Mun. Home Rule Law § 10(1)(ii)(a)(12).

"State law can preempt local law in one of two ways: either through conflict preemption, which occurs when the local and State laws directly conflict, or field preemption, which occurs 'when a local government legislates in a field for which the State Legislature has assumed full regulatory responsibility.'" Glen Oaks Vill. Owners, Inc. v. City of New York, 2025 WL 1458090, at *2 (N.Y. May. 22, 2025) (quoting DJL Rest. Corp. v. City of New York, 749 N.E.2d 186, 190 (N.Y. 2001)).

### 1.

Instacart first argues that the state's Minimum Wage Act (the "MWA") occupies the field of wage laws for workers. In support of this claim, Instacart invokes Wholesale Laundry Board of Trade v. City of New York, 234 N.Y.S.2d 862, 865 (App. Div. 1962), which found it "entirely clear that the [MWA] indicates a purpose to occupy the entire field." This argument fails, however, because the MWA applies only to employees; it does not apply to independent contractors, like Shoppers. See Akgul v. Prime Time Transp., Inc., 741 N.Y.S.2d 553, 556 (App. Div. 2002) ("'Employee' is defined in Labor Law article 6 as 'any person employed for hire by an employer in any employment.' This definition excludes independent contractors ...."). Wholesale Laundry is inapposite because the municipal regulation in that case involved employees, not independent contractors. 234 N.Y.S.3d at 863 ("The local law in question provides that after

its effective date every employer in the City of New York shall pay to his employees a wage of not less than $1.25 an hour.").

Instacart insists in response that the City cannot "explain why employees (as opposed to other types of laborers), instead of minimum-pay standards, constitute the relevant field of preemption." Reply Supp. Pl.'s Mot. Prelim. Inj. ("Reply") 8, ECF No. 34. But no explanation is needed because the answer is clear: the MWA does not purport to regulate minimum-wage standards for anyone other than employees. "The mere fact that the Legislature has enacted specific legislation in a particular field" — here, minimum wage laws for employees — "does not necessarily lead to the conclusion that" it intended to foreclose the broader field. <u>Garcia v. N.Y.C. Dep't of Health & Mental Hygiene</u>, 106 N.E.3d 1187, 1202 (N.Y. 2018). "The key question in all cases is what did the legislature intend?" <u>Id.</u> Yet Instacart has provided no evidence from either the text of the MWA or its legislative history suggesting that the Legislature intended to prevent local governments from regulating the wages of independent contractors.

Instacart also points, without elaboration, to a string of Labor Law provisions regulating independent contractors, such as the "Fashion Workers Act" and the "Trapped at Work Act." <u>See</u> Reply 8 (citing N.Y. Lab. Law §§ 218-b, 1030-1039, 1050-1055). But Instacart does not explain how any of these provisions deal with the wages of independent contractors in general, let alone

demonstrate the Legislature's "desire that its regulations should preempt the possibility of" local regulation. <u>Cohen v. Bd. of Apps. of Vill. of Saddle Rock</u>, 795 N.E.2d 619, 622 (N.Y. 2003).

Finally, Instacart points to the Municipal Home Rule Law, which prohibits local legislation that "[a]pplies to or affects any provision of ... the labor law." N.Y. Mun. Home Rule Law § 11(1)(f). But that argument misreads the Municipal Home Rule Law. "[T]he plain language of th[at] statute requires that, in order to be invalid, <u>a local law must first supersede a State statute</u>, and then it must additionally apply to or affect a provision of one of the enumerated bodies of State law." <u>ILC Data Device Corp. v. Cnty. of Suffolk</u>, 588 N.Y.S.2d 845, 848 (App. Div. 1992). But Instacart does not even attempt to make such a showing.

**2.**

Second, Instacart argues that New York's Freelance Isn't Free Act (the "FIFA") both conflicts with and field-preempts the Local Laws. The FIFA establishes when freelance workers must be paid and requires that a contract between a freelance worker and his or her employer must be in writing. N.Y. Gen. Bus. Law §§ 1410-15. According to Instacart, "the Legislature's express premise was that freelancers' compensation would be <u>contractually</u> established." Mot. 20 (citing N.Y. Gen. Bus. Law §§ 1411, 1412(2)(b)). But this argument fails, too.

As for conflict preemption, Instacart's contention is that any local regulation that imposes a minimum wage for contract workers conflicts with the FIFA's premise that a contract worker's wage be set by contract. But none of the provisions cited by Instacart require that independent contractors set their wages solely by contract. Rather, the FIFA creates a regulatory structure governing, among other things, how independent contractors must be paid when they enter into a contract. Section 1411, which the plaintiff cites, provides only that freelance workers must receive contracted compensation before certain specified times — either on or before the due date under the contract or no later than thirty days after the worker performs the promised service. None of the Local Laws prevent Instacart or its Shoppers from complying with § 1411. The closest Instacart gets to showing a conflict is Local Law 113, which governs when a Shopper must be paid. But as the defendants correctly note, Local Law 113 does not, as Instacart claims, require that Shoppers be paid within seven days of service; rather, it requires that grocery workers be paid "no less frequently than once a week." See N.Y.C. Admin. Code § 20-1523.

Similarly, § 1412(2)(b) requires that any written contract entered into by a freelance worker must include "an itemization of all services to be provided by the freelance worker, the value of the services to be provided pursuant to the contract,

and the rate and method of compensation." But again, nothing in the Local Laws prevents Instacart and its Shoppers from specifically identifying the rate and method of compensation in their contracts.[5]

Instacart's field-preemption argument regarding the FIFA is even less persuasive. According to Instacart, the Labor Law and the FIFA, taken together, form a comprehensive scheme governing all aspects of employees and independent contractors in New York. Reply 9. For that argument to work, Instacart must show more than merely that the FIFA regulates some aspects of freelance work. It must show that the Legislature's intention was to displace all local regulations on the subject. But Instacart fails to provide any evidence that the Legislature intended to do so.

On the contrary, both the text and legislative history of the FIFA suggest the opposite. The bill's sponsor, for example, noted that the "[FIFA] will replicate the labor rights of NYC's Freelance Isn't Free Law in state labor law ... while maintaining the city's local law." Joyce Decl. Ex. F at 2. Similarly, § 1415(5) provides that the FIFA "shall not be construed or interpreted to override or supplant any of the provisions of chapter ten of title twenty of the administrative

---

[5]  If Instacart means to argue that these provisions grant companies and workers an unqualified right to agree to any level of compensation or timeline for payment, then it has failed to provide any textual or legislative support for that claim.

code of the city of New York" — that is, New York's analogous regulations. If the Legislature did not intend for the FIFA to displace the City's own regulations on precisely the same subject, then it is difficult to understand how the Legislature could have intended to reach much further by prohibiting all local regulation of independent contractors.

**3.**

Finally, Instacart makes several miscellaneous arguments that Local Laws 107, 108, 113, and 123 are preempted by state law. But none of these arguments are persuasive.

Instacart first contends that Local Laws 107 and 108, which establish tipping rules for third-party grocery-delivery workers, are preempted because "tipping is intertwined with compensation, and setting pay standards for the State's workers is a task for the Legislature, not the City." Mot. 22. According to Instacart, "[t]he Minimum Wage Act specifically covers tipping in regulating the compensation of covered employees." Id. (citing N.Y. Lab. Law §§ 650–665). But as explained above, the MWA does not apply to independent contractors, and Instacart has not identified any textual or legislative evidence that the Legislature intended the MWA to preempt local laws on tipping independent contractors.

Instacart next contends that Local Law 113 "requires paying grocery-delivery workers within seven days of their services and providing them itemized disclosures of their compensation,"

which allegedly conflicts with §§ 1412(2)(c) and 1411(1) of the
FIFA. Id. at 22. But Instacart is mistaken. As explained above,
any purported conflict between these FIFA provisions and Local
Law 113 is illusory or depends on a misreading of the FIFA
provisions.

Third, Instacart claims that Local Law 123, which imposes
certain recordkeeping and reporting requirements on third-party
grocery-delivery services, is preempted by §§ 1412(3) and
1414(1) of the FIFA, which require companies employing
independent contractors to retain contracts for six years and to
make them available upon request to the Attorney General. But
Instacart does not explain how Local Law 123's requirements
conflict with the FIFA. Instead, Instacart's argument seems to
be that the FIFA preempts the field of recordkeeping
requirements for independent contractors, and therefore even
supplemental local regulations are unlawful. But as explained
above, Instacart has not shown it is likely to succeed on the
merits of its claim that the FIFA is field preemptive.

*    *    *

Because Instacart has failed to show that any provision of
the Labor Law or the FIFA conflicts with or field-preempts any
of the Local Laws, it is unlikely to succeed on the merits of
its state-preemption claim.

22

## c.

Finally, Instacart argues that the Local Laws violate the dormant Commerce Clause. The United States Constitution vests Congress with the power to "regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl.3. "Reading between the Constitution's lines," however, the Supreme Court "has held that the Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also contains a further, negative command, one effectively forbidding the enforcement of certain state economic regulations even when Congress has failed to legislate on the subject." Nat'l Pork Producers Council v. Ross, 598 U.S. 356, 368 (2023). "[B]y its own force," the Commerce Clause "restricts state protectionism." Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 588 U.S. 504, 518 (2019). "[S]tate laws offend the Commerce Clause when they seek to build up domestic commerce through burdens upon the industry and business of other States ...." Nat'l Pork, 598 U.S. at 369. "Today, under the Supreme Court's modern cases, the very core of our dormant Commerce Clause jurisprudence is an antidiscrimination principle expressed through a bright-line rule: the Commerce Clause prohibits the enforcement of state laws driven by economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." Variscite NY Four, LLC v.

N.Y. State Cannabis Control Bd., 152 F.4th 47, 60 (2d Cir. 2025).

The "dormant Commerce Clause," however, does not afford courts "a roving license to decide what activities are appropriate for state and local government to undertake." Rest. Law Ctr. v. City of New York, 90 F.4th 101, 118 (2d Cir. 2024). States still "retain 'broad power' to legislate and regulate, even in ways that may 'bear adversely upon interstate commerce.'" Nat'l Shooting Sports Found., Inc. v. James, 144 F.4th 98, 114 (2d Cir. 2025) (quoting H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 531–32 (1949)). A state law thus violates the dormant Commerce Clause in only three circumstances. First, if the state law "clearly discriminates against interstate commerce in favor of intrastate commerce"; second, if it "imposes a burden on interstate commerce incommensurate with the local benefits secured"; and third, if it "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." Grand River Enters. Six Nations, Ltd. v. Boughton, 988 F.3d 114, 123 (2d Cir. 2021).

Instacart presses only the first kind of argument — that the Local Laws discriminate against interstate commerce in favor of local interests. "For a law to discriminate against interstate commerce, it can either discriminate on its face, harbor a discriminatory purpose, or discriminate in its effect."

Rest. Law Ctr., 90 F.4th at 118. A nondiscriminatory law that "only incidentally burdens interstate commerce," by contrast, "is subject to a more permissive balancing test under Pike v. Bruce Church, Inc., 397 U.S. 137 (1970)," and will run afoul of the dormant Commerce Clause only "if the burden imposed on interstate commerce clearly exceeds the putative local gains." Id.

According to Instacart, the Local Laws "impose special burdens on out-of-state companies like Instacart, while exempting entities with a local retail presence even if they offer identical grocery delivery services." Mot. 24. Local Law 124 defines "third-party grocery delivery services" as "any website, mobile application, or other internet service that: (i) facilitates, offers or arranges for the delivery of goods from a retail food establishment; and (ii) is owned or operated by a person other than the person who owns such retail food establishment." Loc. Law 124 § 2. And "'retail food establishment' means any business establishment located in the city that is licensed as a food processing establishment ... or as a retail food store or food warehouse." Id. Instacart claims that the second clause of the definition of "third-party grocery delivery services," when read with the definition of "retail food establishment," essentially creates "proxies and correlatives for local and non-local," which "is a telltale sign of discrimination against out-of-staters." Mot. 25; see also

Pl.'s Response to City's Post-Argument Ltr. 2, ECF No. 39 ("By using the degree of local presence to determine the degree of regulatory burden, Defendants use an obvious proxy and correlative to discriminate against those beyond the five boroughs.").

Instacart's argument is unpersuasive, however, because it is simply mistaken that that clause distinguishes between in-state and out-of-state companies. The relevant distinction drawn by the legislation is not whether the company is within the state or outside the state, but whether the company facilitates deliveries exclusively from its own stores within the City. For example, if Instacart were headquartered in New York, but maintained its current business model, it would still count as a third-party grocery delivery service and thus be covered by Local Law 124. And creating a single brick-and-mortar Instacart grocery store in the City would not exempt Instacart from the statute either, so long as it continues to provide deliveries from stores other than those it owns and operates. Conversely, if a grocery chain based in New Jersey with even a single store in New York City provides delivery services from its store within the City, but from no other grocery stores, then that company would not qualify as a third-party grocery delivery service and thus would fall outside the scope of Local Law 124.

Instacart resists this conclusion in its supplemental letter by arguing that Local Law 124 effectively creates "an

exemption for purely local grocery delivery services." Response
to City's Post-Argument Ltr. 2. As an initial matter, Local
Law 124 does not contain an "exemption" — it merely defines
"retail food establishment" to include only retail
establishments within New York City. That is unsurprising given
the New York City Council's purpose is to protect workers in New
York City in the same way that other New York City-related labor
laws seek to protect workers in New York City. More importantly,
however, Local Law 124 does not distinguish between firms with
local stores and those without local stores. Rather, the
regulation distinguishes between firms that deliver exclusively
from stores that they own in New York City and firms that
deliver from stores that they do not own, regardless of whether
those stores are located in New York City. A New York City firm
that delivers exclusively from New York retailers — in other
words, a wholly in-state firm — would still be subject to Local
Law 124 unless that firm owned each of the retailers from which
it arranges to have groceries delivered.

Instacart also claims that "discriminatory purpose is
reflected throughout the City Council record." Mot. 26. For
example, Instacart claims that "[t]he Council singled out by
name a small number of third-party platform operators, including
Instacart," and "[n]one operates a retail outlet in the City."
Id. It is unclear, however, why identifying Instacart and its
competitors by name reflects a discriminatory purpose if the

27

purpose of the law is to regulate companies like Instacart and its competitors. If Instacart's point is that the Council singled out foreign companies and left in-state companies with similar business models alone, then that argument also fails — Instacart acknowledges in its own brief that it is "unaware of any New York entity with a business model like Instacart's." Id. 25 n.4. Instacart has not introduced any evidence that if such a business did exist, the Council would have exempted it from the legislation. In other words, the Local Laws are directed at companies that provide grocery-delivery services in New York City from stores that they do not operate irrespective of whether the companies are located in New York City or not. The law is aimed at protecting the people who provide such services in New York City.

Because Local Law 124 is nondiscriminatory and only incidentally burdens interstate commerce, it violates the dormant Commerce Clause only "if the burden imposed on interstate commerce clearly exceeds the putative local gains." Rest. Law Ctr., 90 F.4th at 118. But Instacart does not even attempt to make that showing. Instacart has therefore failed to show that it is likely to succeed on the merits of its dormant Commerce Clause claim.

## IV.

To obtain a preliminary injunction, Instacart must also show that the absence of emergency relief will cause it

irreparable harm. A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009). Irreparable harm exists where, absent an injunction, a movant will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." JTH Tax, LLC v. Agnant, 62 F.4th 658, 672 (2d Cir. 2023).

Instacart argues that it will be irreparably harmed in three ways. First, it contends that the changes it must make to comply with the Local Laws will permanently harm its reputation and goodwill with customers. Second, it claims that its constitutional injury — its dormant Commerce Clause claim — is presumptively irreparable. And third, Instacart argues that the monetary costs of compliance will be unrecoverable because it lacks a cause of action against the City for money damages on its preemption claims.

Instacart has not established on the record currently before the Court that it will suffer irreparable reputational harm because of the Local Laws. Instacart claims that "customers have come to associate Instacart with broad selection, convenient delivery windows, and shoppers who know their customers and how to navigate local markets for them." Mot. 28. The Local Laws will allegedly deprive Shoppers of the "freedom

to work on their own terms," and "[m]any surely will leave the platform as a result." Id. at 28-29. Likewise, "customers will see higher fees, fewer options, and worse services as a consequence," and "[t]hey too may leave the platform as a result." Id. at 29. As proof, Instacart points to "the City's past experience with restaurant-delivery platforms," which allegedly caused forty percent of previously registered workers to leave the industry and led to a ten percent increase in consumer prices. Id.

The plaintiff's alleged reputational harm, however, is speculative and is not borne out by the record. The defendants point to empirical data showing that the City's previous legislation regulating restaurant-delivery workers has not had the effect anticipated by Instacart. It notes, for example, that between 2023 and 2025, food-delivery workers have seen their hourly pay increase by 316 percent; the total number of deliveries each week has increased by twenty-four percent, from 2,632,903 to 3,270,585; and the weekly time spent on deliveries has increased by twenty-six percent, from 814,692 hours to 1,026,401. Declaration of Michael Papadopoulos ("Papadopoulos Decl.") ¶¶ 8-9, ECF No. 32. During the same period, "the fees charged to consumers and merchants by food delivery services have increased by only $2.06 per delivery and $0.52 per delivery respectively." Id. ¶ 12. Despite this modest increase in fees, "total spending on food delivery" has increased by thirty-one

percent. Id.; see also N.Y.C. Dep't of Consumer & Worker Prot.,
Minimum Pay Rate for App-Based Restaurant Delivery: Restaurant
Delivery App Aggregated Tables (2025), https://perma.cc/G82R-
P9ML.

Instacart has therefore failed to show that any
reputational harm would be "actual and imminent" rather than
"remote []or speculative."[6] Rodriguez by Rodriguez v. DeBuono,
175 F.3d 227, 234 (2d Cir. 1999).

Instacart also contends that the alleged injury flowing
from its dormant Commerce Clause claim is constitutional in
nature, and thus presumptively irreparable. But the dormant
Commerce Clause claim is an insufficient basis for irreparable
injury because that claim is unlikely to succeed on the merits.
When a party "is unlikely to succeed on the merits of [a]
claim[,] any irreparable injury premised on th[at] claim[] alone
cannot justify a preliminary injunction." Council for
Responsible Nutrition v. James, 159 F.4th 155, 171 (2d Cir.
2025); see also We The Patriots USA, Inc. v. Hochul, 17 F.4th
266, 294 (2d Cir. 2021) ("[B]ecause [Plaintiffs] have failed to
demonstrate a likelihood of success on their First Amendment or
other constitutional claims ... Plaintiffs fail to meet the

---

[6] Instacart also alludes to "immense associated opportunity costs,
including lost innovation, delayed product improvements, and the
nonquantifiable permanent restricting of Instacart's relationships
with shoppers, consumers, and retailers." Mot. 31. But these
alleged harms are also speculative and lack any non-conclusory
support in the record.

irreparable harm element simply by alleging an impairment of their Free Exercise right.").

Instacart next argues that it lacks a federal cause of action for damages and thus cannot recover the cost of complying with the Local Laws if it is ultimately successful on the merits. However, "ordinary compliance costs are typically insufficient to constitute irreparable harm." Council for Responsible Nutrition, 159 F.4th at 171; see also Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 115 (2d Cir. 2005) (same). Yet these are precisely the kinds of costs Instacart claims it will be unable to recover — those allegedly "extensive and costly changes to its platform and underlying operations" necessary "to comply with the Local laws." Mot. 31.

Finally, Instacart's substantial delay in moving for preliminary relief three months after Local Laws 123 and 124 were enacted and four months after Local Laws 107, 108, and 113 undermines its claim of irreparable injury. When determining whether a movant faces irreparable harm without a preliminary injunction, courts "should generally consider delay" on the movant's part. Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 39 (2d Cir. 1995). Although delay in seeking interim relief "does not always undermine an alleged need for preliminary relief, months-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion

for preliminary relief." <u>Silber v. Barbara's Bakery</u>, 950 F.
Supp. 2d 432, 439 (E.D.N.Y. 2013). Instacart's unexplained delay
thus further weighs against its claim that it is likely to
suffer irreparable harm without a preliminary injunction.

**V.**

The final two considerations in the preliminary-injunction
analysis are whether issuing interim relief would be equitable
and whether it would serve the public interest. "In a suit
against the government, balancing of the equities merges into
our consideration of the public interest." <u>SAM Party of N.Y. v.
Kosinski</u>, 987 F.3d 267, 278 (2d Cir. 2021); <u>see also</u> <u>Team
Kennedy v. Berger</u>, 748 F. Supp. 3d 200, 222-23 (S.D.N.Y. 2024)
(same).

Instacart contends that the Local Laws "intrude on the
federal and New York State government's exclusive authority and
further violate the dormant Commerce Clause," and "neither the
City nor the public has an interest in enforcing a preempted or
unconstitutional law." Mot. 32-33. But this argument fails
because Instacart has not shown a likelihood of success on the
merits of any of these claims. <u>See</u> <u>Council for Responsible
Nutrition</u>, 159 F.4th at 172 (the plaintiff's "arguments on this
element — that the public interest requires adhering to the
First Amendment ... — necessarily fall with its First Amendment
claims").

33

Instacart also claims that granting emergency relief would serve the public interest because "shoppers stand to lose opportunities, consumers stand to lose a service or pay a higher price for it, and retailers stand to lose business." Mot. 33. But as explained above, these claims are speculative. More importantly, they appear to be inconsistent with the City's empirical data measuring consumer prices and worker wages following the implementation of similar regulations for restaurant-delivery workers. Instacart has therefore failed to show that issuing a preliminary injunction would promote the public interest.

**VI.**

The Court has considered all the arguments raised by the parties. If any argument was not specifically addressed, it is either moot or without merit. For the foregoing reasons, Instacart's motion for a preliminary injunction is **denied.**

The Clerk is respectfully instructed to close ECF No. 7.

**SO ORDERED.**

Dated:    New York, New York
          January 22, 2026

                                    _____
                                       John G. Koeltl
                              United States District Judge